## THE STATE OF CONNECTICUT vs. NAPOLEON BISSONNETTE.

Third Judicial District, Bridgeport, April Term, 1910.

HALL, C. J., PRENTICE, THAYER, RORABACK and ROBINSON, Js.

Where there is evidence in support of all the facts necessary to sustain a verdict, it is for the jury to weigh the evidence and decide whether those facts have been proven or not.

While the trial court may, in its discretion, comment on the weight of evidence, it is not bound to tell the jury that certain facts should have great weight with them.

A request to charge which does not adequately state the law as applicable to the claimed facts in the case, may properly be refused.

Inasmuch as proof of malice is essential to establish murder, evidence tending to show the state of mind of the accused toward the decedent at and before the homicide is admissible; but the admission of evidence which tends to prejudice the jury against the accused, without throwing any light upon his mental attitude, as in the present case, is harmful and erroneous.

Evidence of self-serving statements made by the accused are inadmissible in his behalf.

As a general rule one who is assaulted in his own dwelling-house need not retreat, but may resist his assailant even to the extent of taking his life if necessary. If there is an exception to this rule when the assailant has entered by invitation express or implied, there is no occasion to apply it in behalf of an assailant who obviously had no respect for the house or its owner, and who came there, as claimed by the accused, to assault and kill him.

The accused claimed that he believed the decedent, his brother-in-law, who confessedly assaulted him, would kill him or do him great bodily harm. Held that the question of the existence of such a belief and its reasonableness was to be determined by the jury in view of all the facts and circumstances in the case, and that an instruction which virtually authorized or required the jury to consider but one fact or circumstance in the determination of that question, was erroneous and harmful.

Argued April 22d—decided June 14th, 1910.

INDICTMENT for murder in the first degree, brought to the Superior Court in Fairfield County and tried to the jury before Ralph Wheeler, J.; verdict and judgment

of guilty of murder in the second degree, and appeal by the accused. *Error and new trial ordered.* .

It was not disputed upon the trial that Demery, a brother-in-law of the defendant, was killed by a shot from a pistol in the latter's hands. The State offered evidence to prove that the shooting took place in the defendant's kitchen in the presence of two of his daughters. The elder of these daughters, when called by the State, testified that she had always lived with her father until about four weeks prior to the homicide, when he ordered her from his house; that she then went to live with her grandmother and the deceased; that on the evening of the homicide she went to her father's house to see her mother, who had given birth to a child the day before, and that her uncle, the deceased, accompanied her, as she was afraid to meet her father because of his speech and conduct toward her when she lived at home. As she and her uncle entered her father's kitchen from the outside, he entered it from an adjoining room, and seated himself in a rocking-chair near a table in the kitchen. Neither addressed a word to the other upon meeting. Demery, the uncle, addressed the daughter in presence of the defendant, saying: "You stay here for a couple of days and take care of your mother, and if there is anything needed or wanted I will see that you get it." Demery then turned toward the door, when the defendant accosted him, saying: "So you are boss here, are you." At this Demery turned, and, taking off his glasses and placing them on the table, approached the defendant as he sat in the chair, and, seizing him at the throat with one hand, replied, "Yes, I am boss here, and I am going to protect my sister whom you are trying to starve." At this the daughter cried out, "Don't uncle," and he at once desisted from his attack, and dropped his hands to his sides, having had his hand upon the defendant's

throat but a few seconds and with but little violence. Demery had no weapon and offered no violence or threats except as above. The defendant then stood up, and, facing Demery, who was standing three or four feet from him, addressed him in the French language, but in so low a tone that the daughter did not understand what he said. Demery twice interrupted him, saying, "Speak English to me." Immediately thereafter Demery turned partially away, with the purpose of taking his departure, his hands still being at his sides. As he turned, the defendant drew a revolver from his pocket, and fired the shot which killed him.

The eldest daughter, as a witness for the State, having testified to the foregoing facts, was asked by the attorney for the State the following questions: "Q. Miss Bissonnette, after your father ordered you from the house, state to the jury whether you continued after you went to live with your grandmother to supply your mother with money? A. I did on one occasion. Q. When did you first meet with your uncle that evening before going over. A. At the supper table. Q. What did you say, if anything, about going over there or he to you? A. I had been crying. Q. I don't hear you. A. I had been crying and he asked me why and I told him I felt sorry for my mother. Q. What else. A. He said I should take care of her and I told him I was afraid to go."

The other daughter, called as a witness for the State, having testified to the facts which occurred in the kitchen substantially as testified by her sister, was asked the following questions: "Q. What did you give your mamma to eat right along when she was sick? A. I gave her toasted bread and tea. Q. What else, anything else? A. No, sir. Q. Whether a little while before this child was born you had for a period of time there anything else to eat in the house? A. We only

had bread. Q. Nothing else in the house but bread? A. No, sir, just bread. Q. How long before the baby was born was that the situation? A. I don't know. Q. What? A. A couple of weeks before. Q. How many weeks did you go on just bread alone? A. About three days. Q. Nothing else in the house? A. No, sir. A few times my brother used to buy it for us. Q. When you were having nothing but bread in the house to eat, tell the jury whether your father had something else himself? *The Court.* Only your own knowledge— Q. Only what you saw? A. When we would have bread he would go out to the corner and buy rolls and steak, and he would come in and eat it right in front of us children, tomatoes and everything."

The defendant claimed, and offered evidence to prove, that Demery had on several occasions threatened to kill him and had menaced him with personal violence, and that on the evening of the killing Demery seized him by the neck with both hands and choked him, and, still grasping his neck, lifted him to his feet and continued to choke him; that he almost lost his senses, and believed himself in danger of losing his life, and drew the revolver to defend himself, if necessary; and that the revolver was accidentally discharged in the struggle. It was claimed in his behalf that the killing, if intentional, was justifiable in self-defense, and if not justifiable, that it was done in the heat of passion and without malice.

The court charged the jury as follows: "But it would not, of course, be required that a man should retreat out of his own house. He might withdraw somewhat, perhaps, without leaving the house. A man must do what seems reasonably necessary under the circumstances, and all the circumstances under which an assault is made upon him, to preserve himself from personal danger, with this limitation, that he must

never take the life of a fellow-being who is assaulting him, when such fellow-being is no more than committing an ordinary assault and battery, or beating upon him, unless in a case of extreme necessity, as the only practicable method of saving his own life, or protecting himself from great bodily harm, and even then he must not have brought upon himself the necessity which he sets up in his defense, by either beginning or continuing in a fight. . . . Any man in his own house, or in the peace anywhere, who is attacked by another under circumstances indicating an intention to take his life or do him great bodily harm, may lawfully kill his assailant while that assailant is thus attacking him, provided he use such reasonable means as are reasonably open to him under the circumstances, to avoid the necessity, with safety to himself. . . . A knowledge on the part of Bissonnette that Demery was irritated or indignant at what he thought was ill treatment of his sister, might perhaps lead to a reasonable belief that Demery might make an ordinary assault upon him for that reason, and give him a licking, while it would not naturally lead Bissonnette to think that Demery would kill him, or do him great bodily harm, for such a reason. A belief on the part of Bissonnette that Demery would do him great bodily harm for that reason might not be a reasonable belief, even after the assault which Demery admittedly made upon him while he was sitting in the chair, or while he was standing up, if Demery then had hold of his throat."

The defendant assigns as error the court's refusal to set aside the verdict, its refusal to charge certain requests of the defendant, its admission of the evidence above stated, and the foregoing instruction to the jury.

*John C. Chamberlain* and *George Kane,* for the appellant (the accused).

*Stiles Judson,* State's Attorney, for the appellee (the State).

THAYER, J.   The court correctly refused to set aside the verdict and grant a new trial.   There was evidence in support of all the facts necessary to sustain the verdict, and it was the jury's province to weigh the evidence and say whether those facts were proven or not.

The claim that there was error in the court's refusal to charge as requested is without foundation.   The court charged all the defendant's requests, except the third and sixth, in substance and practically in the language of the requests.   The sixth was a request that the court should instruct the jury that certain facts should have great weight with them.   The court might, in its discretion, comment on the weight of the testimony, but it was not bound to do so, and the weight to be given to it was for the jury.   It was not error to refuse the request.   *State* v. *Smith,* 49 Conn. 376, 387. The third request was not a full statement of the law as applicable to the claimed facts in the case, and was properly refused.

All the questions asked the two daughters which appear in the statement were objected to.   They were admitted upon the ground that they might serve to indicate what was or ought to have been the state of mind of the accused at the time of the homicide; that the condition in the household might tend to show whether the accused really believed that Demery came to the defendant's home to kill him, or for some other purpose.   The purpose for which it was admitted was thus to show malice, and that the accused had no reasonable ground for believing himself in danger of great bodily injury from the assault which admittedly was made upon him.

The State was bound to prove that the killing was

with malice. That is a fact to be proved like any other fact. It may be proved by declarations on the part of a person charged with crime showing express malice, or it may be proved by circumstances from which malice may be inferred as a question of fact. Any facts showing what the defendant's state of mind was toward Demery at and before the homicide would be admissible, therefore, as bearing upon the question whether the killing was done with malice.

Did the testimony of the daughters tend to show his state of mind? Could the fact that the elder daughter, after she left the house, gave her mother money (it not appearing that this fact was known to the father or uncle) indicate in any degree the defendant's state of mind toward the uncle? Could the fact that the defendant had different and a greater variety of food than his wife, do so? These facts, in themselves, have no tendency to prove the condition of mind of the defendant. It is claimed that, when charged by Demery with starving the wife, the defendant's feelings would be different if the charge were true than they would if it were false; that in the former case his feeling would be that of humiliation, while in the latter it might be that of just indignation. If this were true, it would not justify the admission of the testimony in question. The two questions last referred to do not tend to prove that the wife was being starved. The same is true of the other questions. They show simply that the wife was not supplied with a variety of food. They do not show that the food which she had was deficient in quantity or quality. The jury might be convinced by it that she ought to have had different food, and a greater variety, and so draw the inference that the defendant was a poor husband and a mean man, especially if they were satisfied that he at the same time provided himself with better and a greater variety of food. Such an in-

ference would tend to prejudice the jury against the defendant, and thus the admission of the testimony would be harmful to him. The evidence should have been excluded.

The testimony of the defendant's witness Max Frederick was properly excluded. The statements of the defendant which it was sought to prove thereby were self-serving, and for that reason inadmissible.

We think that error is well assigned upon that portion of the charge which relates to the duty of a person assaulted within his own home to retreat before killing his assailant. The general rule is that where one, without fault himself, is assaulted in his dwelling-house, he need not retreat from his assailant, but may resist the assault even to the extent of taking the life of his adversary when necessary. It is claimed that there is an exception to this rule, and that when the assailant has come into the house by invitation, express or implied, as for business purposes, and while there gets into an altercation with the owner and starts to assault him, the latter is required to retreat reasonably to avoid the conflict. The charge complained of does not make this distinction, but gives the jury to understand that in any case the person assailed in his own house should, if he can do so without leaving his house, withdraw somewhat in order to avoid the conflict. The evidence on both sides showed that Demery was not in the defendant's house with any respect for it or its master. He did not greet the defendant as he entered it. He gave directions with respect to what should be done within it. He declared himself to be the master of it. He then proceeded to assault the owner of it as he was seated in his chair. The defendant claimed that Demery entered the house wrongfully, with the purpose to assault and kill him. The charge complained of did not sufficiently meet this aspect of the case.

We think that the remaining part of the charge complained of is open to the same criticism. The jury were told that knowledge on the part of the defendant that Demery was irritated and indignant at what he thought was ill treatment of his sister might lead to a reasonable belief that Demery would make an ordinary assault upon him for that reason, but that it would not naturally lead him to think that Demery would kill him, or do him great bodily harm, for that reason; that such belief would not be a reasonable belief. That may be true, if the jury were to decide as to Bissonnette's belief concerning Demery's intentions solely from the fact that the latter was indignant at the treatment of his sister. But Bissonnette's belief might be formed from other facts in connection with that. If Demery, to the knowledge of the defendant, had long entertained hostile feelings toward him, and had threatened to kill him, these facts, as well as the nature of the assault, were to be considered in connection with the recent irritation arising from the supposed ill treatment of his sister in her confinement. Whether, in view of all the facts, the defendant was justified in believing that Demery meant to kill him, or do him great bodily harm, was a question of fact for the jury. The recent irritation was only one of the facts from which they were to draw their inferences.

There is error and a new trial is ordered.

In this opinion the other judges concurred.