## Oney v. Commonwealth.

(Decided September 28, 1928.)

### Appeal from Magoffin Circuit Court.

1. Criminal Law.—Defendant's objection to certain testimony held waived by his subsequent cross-examination of commonwealth's witnesses in respect to the same matter.

2. Homicide.—In prosecution for murder of defendant's brother-in-law, evidence that defendant and deceased had been drinking liquor together shortly before the shooting held properly admitted to show the condition of the men at time of homicide.

3. Homicide.—In prosecution for murder, it was not error to show map to defendant's 12 year old stepdaughter and ask her whether it fairly well represented the building and fences on defendant's property where crime was committed.

4. Homicide.—Evidence that defendant, immediately before the homicide, had stated to his daugther, "Nettie, G—— d—— you, if I do anything and you swear a lie, I'll kill you," held competent and admissible.

5. Criminal Law.—Admitting testimony of accused's statement to his daughter immediately before homicide, "Nettie, G—— d—— you, if I do anything and you swear a lie, I'll kill you," held in any event not error, where defendant did not object thereto when it was offered.

6. Criminal Law.—Admissions made by a defendant against his interests are competent as substantive evidence against him, and it was therefore not necessary for commonwealth to ask accused in homicide case about statements claimed to have been made by him after his arrest before introducing proof to show that he did make them.

7. Homicide.—Where there is any evidence in murder case, however slight, tending to show guilt of accused, the case should go to the jury.

8. Homicide.—Self-defense instruction in homicide case held not confusing or erroneous because it referred to defendant's wife, who had been a widow when she married defendant, by her name prior to her marriage to defendant.

9. Homicide.—Failure to instruct on accidental shooting in homicide case held not error, where accused testified that he fired shot because he thought he would be killed if he did not.

10. Homicide.—In prosecution for shooting and killing defendant's brother-in-law while he was an invited guest in defendant's home,

held that "defense of castle doctrine" did not apply, and instruction thereon was properly refused.

A. J. MAY and T. J. ARNETT for appellant.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

Lee Oney killed Ramey Wireman. He was charged by indictment with murder, upon his trial under that indictment he was found guilty of manslaughter, and his punishment fixed at 21 years in the penitentiary. His motion for a new trial was overruled, he excepted, and has appealed.

Oney was constable of Magoffin county, and lived on Puncheon creek. On the day of the homicide, he had started up Buck creek to serve some process. On the way he stopped at the home of Henry Hale, and there he met his brother-in-law, Ramey Wireman. Some liquor was procured, of which Wireman and Oney both partook, and then manifested their generosity by passing it to the others present. They spent considerable time there. Oney obtained information that some of the parties for whom he had process were sick, and because of that, as well as the time spent, he decided to abandon the trip and return home. At his invitation, Wireman went home with him. When he got there, Oney asked his wife, who was a sister of Wireman, to kill a chicken and fix them a nice supper. Oney went out of the house to attend to the milking and other chores. While he was out, Wireman produced his liquor, and he and his sister partook of it After supper was prepared, all gathered at the table, but Wireman was not feeling well, and, after eating sparingly, he left the table, went into the family room and lay down on the bed. As he left the table, he whispered to Jane Allen, the 12 year old daughter of Mrs. Oney, and the stepdaughter of the defendant, and, in that whispered conversation, told her he wanted to go to bed and wanted her to pull his overcoat off, and she did so assist him. She testifies that when that was done, Oney remarked, "Watch that G—— d—— s—— of a b——, I don't like no such business whispering around." This Oney denies. Oney left the table. went into the bedroom, and tried to induce Wireman to return and finish his supper, which

Wireman refused to do, saying he was sick. Oney returned to the table. His wife came to him, sat down in his lap, and they talked for a few minutes; then Oney started back to where Wireman was in bed. His wife followed him, and he and his wife got into a difficulty over something. She was trying to take his pistol away from him. In the scuffle, this pistol was discharged, and the ball, it seems, struck a piece of wood in the fire. Wireman raised up, and Oney says that, when he raised up, he had his pistol drawn. The witnesses seem to agree that Wireman said to Oney and to his sister, Mrs. Oney, that they ought to be ashamed of their conduct. Oney undertook to take Wireman's pistol away from him. When he did that, Mrs. Oney picked up the poker, caught Oney by the hair, and was beating him over the head and across the back with the poker, and trying to pull him away from her brother Wireman. Wireman refused to surrender his pistol, and the two men struggled for the possession of it; Mrs. Oney in the meantime beating a tattoo upon her husband with the poker. In that struggle, Oney shot and killed Wireman with an automatic pistol.

As grounds for reversal, the first contention of Oney is that the court erred in the admission and rejection of evidence. It seems that some one had, at some time, given Oney the nickname of ''Jug,'' which he did not like, and he insists the court erred when it allowed the commonwealth to show that, when these men were about to leave Hale's, Wireman said to Oney, ''Go on, Jug,'' to which Oney replied, ''Ramey, I'll kill you.'' Oney's objection to this had been overruled, as well as his objection to the evidence about the drinking and whisky at Hale's. The commonwealth then withdrew the evidence relative to the liquor at Hale's, and the court admonished the jury not to consider it. Oney then proceeded to cross-examine a witness, and, in his cross-examination, went into this question of liquor, by doing which he waived his objection to the evidence about it. Oney also proceeded to cross-examine Hale about this alleged threat to kill Wireman, and made the witness admit that the remark was jokingly made, and that Oney was laughing when he said it, and it was also established that Wireman said, ''Lee, I won't call you that any more.'' This shooting occurred about dark, and the commonwealth was permitted to prove, over the objection of defendant, that about 2 o'clock in the afternoon of that day Oney and Wireman were drinking. The court having excluded the

evidence about this drinking upon the motion of Oney, and Oney having thereafter reopened the subject and cross-examined Hale on that subject, we are unable to see how it was error for the commonwealth to be permitted to ask Margaret Shepherd about the condition of these men. This occurred just a short time before the shooting, and it was proper to admit this evidence for the purpose of showing the condition of the men at the time of the homicide.

During the examination of Jane Allen, the 12 year old stepdaughter of Oney, she was shown a map which was explained to her, and she was asked if that map did fairly well represent the buildings, fences, etc. She said it did, and Oney insists that was erroneous, but we cannot agree with him. This child further said, in answer to a question about what Oney had said, that, as Oney started from the table into the room where the shooting occurred, he said to his little child, "Nettie, G—— d—— you, if I do anything and you swear a lie, Ill kill you." A complete answer to his objection to that is that he did not object to the evidence when it was offered. Besides we are unable to see why the evidence would not have been competent. Oney denied the statement in his evidence, but did not ask his daughter, Nettie, anything about it when she was on the stand.

After the defendant had closed his evidence, and during the introduction of the commonwealth's evidence in rebuttal, the commonwealth was permitted, over Oney's objection, to recall Oney and to ask him about whether or not he said certain things, on his way to Salyersville after his arrest. Evidently the commonwealth thought it necessary to ask these questions in order to lay the grounds for the contradiction of Oney and thereby impeach his testimony. Oney, in answer to these questions, said that he was so excited and terrified at the time he did not remember what he said. Thereupon the commonwealth introduced a witness who testified that Oney did make the statements he had been asked about, and the judge admonished the jury they should consider that evidence only for the purpose of contradicting Oney, and that the jury would be the judge of whether or not it did contradict him. Admissions made by defendant against his interest are competent as substantive evidence against him, and it was not necessary for the commonwealth to ask Oney about making those statements before introducing proof to show he did make

them, so there is nothing in this contention. The commonwealth was entitled to prove these statements, not as contradictions of Oney's evidence, but as substantive evidence for the commonwealth.

He insists that he was entitled to a directed verdict for acquittal. "Where there is any evidence, however slight, tending to show guilt of the accused, the case should go to the jury." Simmons v. Com., 207 Ky. 570, 269 S. W. 732; Fleming v. Com. 219 Ky. 697, 294 S. W. 153; Pitts v. Com., 215 Ky. 837, 287 S. W. 32.

Mrs. Oney was a widow Allen when she married Oney, and in the self-defense instruction, the court said to the jury that, if Oney "had reasonable grounds to believe that the said Ramey Wireman, Jane Allen, Hagar Sizemore, Mary Allen, or Nettie Allen, or any one or more of them, acting in concert with Ramey Wireman, was about to inflict upon him (Lee Oney) death or great bodily harm," etc. Oney now insists that it was error for the court to name his wife as Mary Allen, whereas she was in fact Mary Oney, and that on account of such misnomer the instruction was confusing and erroneous. Mrs. Oney's name appears in the evidence fourteen times; thirteen times she is referred to simply as "Mary" and once as "Mary Oney," and the jury could not have been confused or have misunderstood who was meant by Mary Allen.

He next insists that he should have had an instruction on accidental shooting, but there is nothing in that contention, because his own evidence was:

"Q. 68. Why did you shoot at the time you did? A. I thought I would be killed if I did not.

"Q. 69. That was the reason you fired? A. Yes, sir."

Oney insists that the instructions were further erroneous in failing to state to the jury his right to defend his castle, but we must remember that Ramey Wireman was in this house by Oney's invitation. He was not an intruder, and therefore the "defense of castle doctrine" does not apply. See 30 C. J. 83, and Eversole v. Com., 34 S. W. 231, 17 Ky. Law Rep. 1259. Oney's motion for a new trial was properly overruled.

The judgment is affirmed.