STATE OF CONNECTICUT *v.* PETER J. CATAUDELLA

ALCORN, C. J., HOUSE, COTTER, THIM and RYAN, Js.

Argued May 7—decided June 29, 1970

*Charles G. Karanian,* for the appellant (defendant).

*Richard A. Schatz,* assistant state's attorney, with whom, on the brief, was *John D. LaBelle,* state's attorney, for the appellee (state).

RYAN, J. In a substituted information in six counts the defendant was charged with the crime of wilfully and corruptly altering books, records or documents in the possession or under the control of the department of motor vehicles of the state of Connecticut in violation of § 53-153 of the General Statutes.[1] Upon the trial to the jury, the defendant was found guilty as to the first, second, fifth and sixth counts and not guilty as to the third and fourth counts of the information. Upon the refusal of the court to set aside the verdict, the defendant appealed from the judgment rendered.

In his assignments of error the defendant claims that the state failed to present sufficient evidence to prove a violation of § 53-153 as to any of the counts upon which he was found guilty. He urges that as a matter of law he did not alter a public record within the meaning of the statutes and claims that the trial court erred in its refusal to grant his motions to dismiss, to direct a verdict for the defendant, and to set aside the verdict of the jury. The jury could reasonably have found the following facts: The division of operator control, hereinafter referred to as the division, is an administrative section of the motor vehicle department. When an operator's

---

[1] "Sec. 53-153. UNLAWFUL REMOVAL OR ALTERATION OF RECORDS. COUNTERFEITING SEALS. Any person who, wilfully and corruptly, takes away, alters, mutilates or destroys any book, record, document, archive or other property in the possession or custody or under the control of any institution, board, commission, department or officer of the state or any county or municipality or court, or who counterfeits the seal of this state or the seal of any court or public office entitled to have and use a seal, and makes use of the same, or, with evil intent, affixes any of the said true seals to any document, or who has in his possession any such counterfeited seal, and wilfully conceals the same, knowing it to be falsely made and counterfeited, shall be imprisoned in the State Prison not more than ten years."

license is suspended, the division opens a file for that person. The entire file constitutes the driving record of the person and contains a blue card, a document called the operator's driving history,[2] reinstatement slips, court abstracts and correspondence. When the conviction of an operator results in suspension, it is recorded on the operator's driving history, a copy of which is sent to the division, and the notice of suspension is sent to the operator. The reinstatement slip, a record kept in the regular course of business by the division, is issued after a hearings officer decides to reinstate an operator's license. The original copy is sent to the operator, one carbon copy is sent to the local police, one to the data processing department, and one is retained by the division. Unless these copies are processed, the operator's driving history will not reflect the reinstatement.

The file of every operator who has been suspended for a motor vehicle violation contains a blue card. These cards are work sheets on which hearings officers record activities relating to the particular case, and entries are recorded in the regular course of business, dealing with telephone conversations, correspondence, hearings, conferences and departmental action. The blue card is necessary to the proper operation of the division. The decision made by the hearings officer concerning suspension or reinstatement of a license may be affected by entries on the blue card. It should contain accurate and truthful information, since inaccurate information on the blue card may cause an improper reinstatement.

[2] Throughout this opinion, wherever "operator's driving history" is mentioned, reference is made to a specific document bearing that title and kept in an operator's file by the division of operator control.

When the blue card so directs, a reinstatement slip is issued, and the operator's driving history records this. There is a direct causal relationship between the blue card and the operator's driving history. The defendant was a hearings officer in the division during the period from October, 1964 to March, 1965. A hearings officer may reinstate an operator whose license has been suspended, but he has no discretion to reinstate an operator prior to the expiration of any prescribed mandatory suspension period.

At the outset, it should be noted that the various documents and papers described, including the blue card, are records and documents in the possession, custody and control of the motor vehicle department of the state of Connecticut within the meaning of § 53-153. See note, 69 A.L.R.2d 1095, 1096.

As to the first count of the information, relating to Robert Strobel, the jury reasonably could have found the following facts: Strobel was arrested, and he pleaded guilty on April 9, 1964, to a charge of operating under the influence of intoxicating liquor in violation of what is now § 14-227a of the General Statutes. Strobel was the holder of a provisional license. His license was suspended, and he was not eligible for reinstatement until March 23, 1965. The defendant made the following entries on Strobel's blue card: "October 19, 1964—telephone call from father of above. Complained that he was over twenty-one when arrested for this charge. Why do we use a different rule for some people. Advised him of procedure. P.J.C."; (October 28, 1964) "with above's attorney, advised him we will check into possibility of change of policy in department. P.J.C." Strobel's father died in 1959, and Strobel was never represented by an attorney. Although on October 28, 1964, the defendant wrote "No consideration

until 1965" on a form pertaining to Strobel entitled "Operator Control Division Conference Request", a reinstatement form was issued to Strobel on that date, and the box on that form which said "Eligible for renewal of regular license" had been checked. The three copies of the reinstatement form were not processed as required by departmental practice, and Strobel's operator's driving history indicates only that his license was revoked. If the reinstatement of Robert Strobel had been made in the ordinary course of business, it would have been reflected in the operator's driving history. The three copies of the reinstatement slip were found in a box near the defendant's desk in May, 1965. Robert Strobel paid $325 to Earl DeFelice, who in turn gave the money to Chester Orsini to get the license back.

The jury reasonably could have found the following facts concerning the second count of the information, relating to Joyce Buckland: Joyce Buckland was arrested for speeding on October 1, 1964, and a notice of suspension was forwarded to the motor vehicle department on November 18, 1964, when she failed to appear in court on that day in violation of § 14-140 of the General Statutes. Her license was suspended on December 7, 1964, and she was not eligible for reinstatement prior to the disposition of the court proceeding. On December 8, 1964, the defendant made the following notation on Joyce Buckland's blue card: "With above . . . advised that she had gone down and paid her fine . . . ."; "telephone call to the Court revealed above is true"; "gave me license." On a division conference request form of the same date, the defendant made the notation "took license." Joyce Buckland did not leave her license with the defendant on December 8, 1964, nor had she paid the fine or advised the defendant

that she had. She did not give up her license until June 10, 1965, and the fine was not paid until December 10, 1965, at which time her license was returned. On September 9, 1965, Attilio Lombardi, a hearings officer, made an inaccurate entry on the blue card of Buckland as a result of the defendant's entry of December 8, 1964, to wit, that her license had been received on December 8, 1964.

As to the fifth count of the information, concerning John R. Young, the jury reasonably could have found the following facts: Young was arrested for separate offenses on June 26, 1963, and November 21, 1963, and again on October 11, 1964, each time for violating § 14-215 of the General Statutes—operating a motor vehicle while his license was suspended. On each occasion he pleaded guilty and was not eligible for reinstatement until January 26, 1966. Young's blue card has the following notation, dated March 1, 1965: "with brother of above. This should have been heard before but we were waiting for the second case to be cleared, we waited, but it turns out that it was a re-arrest and that the case was settled some time ago." John R. Young was not rearrested, and neither he nor his brother, Horace Young, ever told the defendant that John Young had been rearrested for the same offense. On April 1, 1965, Young was reinstated, and the reinstatement slip, initialed "P.J.C.", indicates that Young was "eligible for renewal or regular license," although the file does not indicate any basis for the reinstatement. On March 11, 1965, John R. Young saw the defendant at the motor vehicle department after Young had been given an eye examination at the department. The defendant told Horace Young, John R. Young's brother, that the wrong hearings officer was on, and told him to go outside and telephone the motor

vehicle department and say that John R. Young could not show up for the hearing. On April 1, 1965, John R. Young gave his brother, Horace Young, the sum of $100 at the motor vehicle department. On the same day Young and his brother Horace attended a hearing before the defendant at the motor vehicle department and Horace preceded John into the defendant's office. Horace and the defendant were friends and fellow employees. The defendant gave John R. Young a reinstatement slip on April 1, 1965, and he was reinstated by the defendant as of that date. On July 28, 1965, Young was summoned to appear before the motor vehicle department. Young met the defendant at a furniture store on July 28, 1965, prior to Young's hearing at the motor vehicle department. At the furniture store, the defendant told Young: "[D]on't say any more than you said at my hearing," and the defendant further told him not to mention anything about money. During the month following his hearing of April 1, 1965, Young gave his brother, Horace, the sum of $350 for getting his driver's license reinstated. In March, 1966, Horace installed storm windows and doors at the defendant's home without expectation of payment.

As to the sixth count of the information, concerning Anthony A. Detelj, Jr., the jury reasonably could have found the following facts: On September 11, 1964, Anthony A. Detelj, Jr., was arrested in New Jersey for speeding, and his license was suspended by the motor vehicle department of Connecticut on March 17, 1965, for failure to appear in court in New Jersey. The following entry, dated March 25, 1965, appears on Detelj's blue card: "With above the father showed me REC from New Jersey Court that fine was paid and posted on September 27,

1965";[3] "reinstate license pending court disposition, P.J.C." Neither Detelj nor his father ever showed the defendant the New Jersey court receipt, nor told the defendant that the fine was paid. Detelj's license was reinstated on March 25, 1965, although he was not eligible for reinstatement in Connecticut until he appeared before the New Jersey court in connection with the speeding charge. A hearings officer should not reinstate a license suspended for an out-of-state violation without written evidence of disposition by the foreign court. Detelj had not appeared before the New Jersey court on or before July 9, 1965. Detelj was suspended in Connecticut on July 15, 1965, for his failure to appear before the New Jersey court. New Jersey reinstated Detelj on October 27, 1965, after his court appearance there.

The fundamental claim of the defendant is that the state has failed by this evidence to establish any violation of § 53-153 of the General Statutes and that the trial court should have set aside the verdict. The defendant urges that he at no time caused any erasure of material on the blue cards or anywhere else in the files of the motor vehicle department and that he did not change any of the statements already on the blue cards or eliminate or change any of the existing records referred to as the operator's driving history. He urges that altering is "a change of a thing from one form or state to another; making the thing different from what it was without destroying its identity"; that an alteration is "an act done upon the instrument by which its meaning or language is changed"; and that the trial court erred in failing to set aside the verdict.

[3] The "5" in "1965" is marked over in pencil, and it is obvious from the other dates that 1964 was intended.

This court has not been required to interpret this statute on any prior occasion in a criminal case. In seeking to ascertain the legislative intent, we may look to the history of the statute and the policy underlying it. *State* v. *Moreno,* 156 Conn. 233, 239, 240 A.2d 871; *Lee* v. *Lee,* 145 Conn. 355, 358, 143 A.2d 154; *State* v. *Cambria,* 137 Conn. 604, 606, 80 A.2d 516. The statute in question is of ancient origin. In 1821 the predecessor of § 53-153 provided as follows: "Every person who shall wilfully and corruptly embezzle, take away, withdraw, impair, raze, alter or destroy any record, or parcel of the same, will, testament, codicil, deed, writ, return, process, or other proceeding in any court of record, or in the office of the secretary of this state, or in the office of the clerk of any county, town, city, borough, or other incorporated society or community in this state, with an intention thereby to defeat, injure, or prejudice the estate, right, or title of any person, or body politic, or corporate" shall be punished. Statutes, 1821, p. 160 § 47.

One meaning of the word "embezzle", now obsolete, was "to make away with". Webster, Third New International Dictionary. The meaning of "raze", now obsolete, was to "erase, efface, obliterate". Webster, Third New International Dictionary. The statute continued unchanged through various revisions until 1874 (see Rev. 1875, p. 555) when certain amendments were made and the provisions of another statute concerning counterfeiting of the seal of the state of Connecticut were combined with it. The statute, as amended, provided, in pertinent part, as follows: "Every person, who shall willfully and corruptly take away, alter, or destroy any record, or parcel of the same, or any document . . ." shall be punished. The words "embezzle", "with-

draw", "impair" and "raze" were deleted. Rev. 1875, p. 507 § 3. In 1939 the act was amended to its present form by § 1438e of the 1939 Cumulative Supplement to the General Statutes, and the language, in pertinent part, became "take away, alter, *mutilate* or destroy." (Emphasis added.)

"The words used [in a statute] are to be construed according to their commonly approved usage. General Statutes § 1-1; *Hardware Mutual Casualty Co.* v. *Premo,* 153 Conn. 465, 474, 217 A.2d 698; *State* v. *Benson,* 153 Conn. 209, 214, 214 A.2d 903; *Baker* v. *Norwalk,* 152 Conn. 312, 315, 206 A.2d 428. Or, stated another way, statutory language is to be given its plain and ordinary meaning. *State* v. *Taylor,* 153 Conn. 72, 82, 214 A.2d 362." *Klapproth* v. *Turner,* 156 Conn. 276, 280, 240 A.2d 886. It is apparent that the purpose of the General Assembly was to protect the books, records and documents enumerated in the statute not only from removal, mutilation or destruction but from alteration in such a way as to destroy their meaning and contents. The preservation of such records and documents would be of no value unless the integrity of their content is protected.

An important consideration in the instant case is the construction of the word "alter". The defendant contends that his actions did not constitute an alteration of the blue card since no statement previously recorded was erased or changed in any manner, and that since the blue card is only a series of memoranda made by various individuals noting their actions, the making of a new notation did not change, in any way, the content of these records as they existed when they came into his possession. The position of the state in respect to its claim that the defendant altered records or documents in the motor

vehicle department is as follows: First, in making false entries upon a document or entry the defendant has altered or changed the record or document itself. Secondly, in making false entries upon a document or record or in issuing reinstatement slips with a false representation appearing thereon, or in failing to cause reinstatement slips to be distributed in accordance with departmental regulation or policy, the defendant has altered or changed the driving record of the operator in question. Thirdly, in making false entries upon a document or record and in predicating the reinstatement of an operator upon such false entries the defendant has caused other documents and records of the motor vehicle department to be altered or changed.

"Alter" means "to cause to become different in some particular characteristic (as measure, dimension, course, arrangement, or inclination) without changing into something else." Webster, Third New International Dictionary. The same dictionary defines "alteration" as "a change in a legal instrument that changes its legal effect either in the obligation it imports or its force as legal evidence—distinguished from *spoliation*." Black, Law Dictionary (4th Ed.) defines "alter" as follows: "To make a change in; to modify; to vary in some degree; to change some of the elements or ingredients or details without substituting an entirely new thing or destroying the identity of the thing affected. . . . To change in one or more respects, but without destruction of existence or identity of the thing changed; to increase or diminish." Black, Law Dictionary (4th Ed.) defines "alteration" as follows: "A change of a thing from one form or state to another; making a thing different from what it was without destroying its identity. . . . An alteration is an act done

upon the *instrument* by which its meaning or language is changed. If what is written upon or erased from the instrument has no tendency to produce this result, or to mislead any person, it is not an alteration."

The evidence produced by the state was adequate to establish that numerous entries made by the defendant upon the blue cards were false and that these false entries changed the disposition of matters involving the reinstatement of the operator's license in each of the four cases under discussion.

The documents which came to the defendant in each case consisted of a case jacket containing a blue card, a document called the operator's driving history, reinstatement slips, court abstracts and correspondence. The evidence does not indicate that the defendant interlineated, substituted words, erased or changed any of the language of these documents as they existed when they came to him. Essentially, he had in the file the driver's previous history and the information relating to the offense as a result of which the suspension of that driver arose. The defendant made no changes in any of the recitals of any of the documents in the files. He did make false entries which resulted in restoration of licenses contrary to statute and the regulations of the department of motor vehicles.

Section 53-153 is a penal statute and should be strictly construed. *State* v. *Moreno,* 156 Conn. 233, 238, 240 A.2d 871. "A statute imposing a penalty should receive a strict construction in favor of those who might be subject to its provisions. '[N]o act should be held to be in violation . . . which does not fall within its spirit and the fair import of its language.' *Morin* v. *Newbury,* 79 Conn. 338, 340, 65 A. 156; *State* v. *Faro,* 118 Conn. 267, 273, 171 A. 660;

*State* v. *Parker,* 112 Conn. 39, 46, 151 A. 325." *Hartford-Connecticut Trust Co.* v. *O'Connor,* 137 Conn. 267, 274, 76 A.2d 9. "While a criminal statute is not to be defeated by an unreasonably strict construction of its language, it must be rather strictly construed so that the conduct made criminal will be ascertainable with reasonable certainty from a careful reading of the statute. A corollary to this is the rule that the meaning of a penal statute 'cannot be extended by presumption or intendment.' *State* v. *Zazzaro,* 128 Conn. 160, 167, 20 A.2d 737". *State* v. *Benson,* 153 Conn. 209, 215, 214 A.2d 903. However, "[t]he rule that penal statutes are to be strictly construed need not be applied so tightly that an obvious legislative purpose or intent is stifled. *State* v. *Levy,* 103 Conn. 138, 141, 130 A. 96; *State* v. *Faro,* 118 Conn. 267, 273, 171 A. 660." *State* v. *Scarano,* 149 Conn. 34, 39, 175 A.2d 360.

In the long history of the statute in question there is no known instance of a conviction of anyone in a court of record for a criminal violation of its terms. Upon a careful consideration of the language used, we are of the opinion that it was not intended to and does not apply to the factual situation in the instant case. There is a sharp distinction between the making of false entries in a document and an alteration of preexisting language. An examination of cases and statutes in other jurisdictions indicates that many of the statutes in other states provide for "false entries" as well as "alterations". The state has not cited any case in point in this state or in any other jurisdiction concerning the meaning of "alteration" in a context similar to the one in the instant case, nor are we aware of any such case.

We have certain statutes which provide a penalty for the making of false entries in the records of

public utility companies and banks. See General Statutes §§ 16-33, 36-6. Section 53-364 of the General Statutes is one of general application and provides, in pertinent part, as follows: "Any officer or agent of any public community who, with intent to prejudice it, . . . *makes upon its books any false entry* . . ." shall be punished. (Emphasis added.) Under this statute the state has been held to be a "public community" and an employee has been held to be an "agent" within the meaning of the statute. See *State* v. *Schiller,* 6 Conn. Sup. 252, 256, and *State* v. *Clerkin,* 58 Conn. 98, 19 A. 517.

In the instant case the defendant was not charged with making false entries on records or documents. The charge was that he altered books, records or documents in the possession of or under the control of the department of motor vehicles of the state of Connecticut. The evidence does not support a conviction of the defendant, and the court erred in failing to set aside the verdict.

Since this conclusion is dispositive of the appeal, there is no need to discuss the other assignments of error.

There is error, the judgment is set aside and the case is remanded with direction to render judgment that the defendant is not guilty and ordering that he be discharged.

In this opinion the other judges concurred.