STATE OF CONNECTICUT *v.* JAMES SHAW, JR.

BOGDANSKI, C. J., SPEZIALE, PETERS, HEALEY and ARMENTANO, Js.

---

Argued June 5—decision released August 18, 1981

*Richard Emanuel,* assistant public defender, with whom, on the brief, was *Jerrold H. Barnett,* public defender, for the appellant (defendant).

*Linda K. Lager,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Thomas O'Keefe,* assistant state's attorney, for the appellee (state).

SPEZIALE, J. After a trial to a jury the defendant, James Shaw, Jr., was convicted of first degree assault in violation of General Statutes § 53a-59 (a) (1). The defendant has appealed from the judgment rendered thereon, claiming the following as error: (1) the trial court's failure, in its instructions to the jury on self-defense, to charge as requested that the defendant had no duty to retreat in his dwelling and that greater-than-necessary force may be employed when in the heat

of passion; (2) the trial court's denial of the defendant's motion in limine and subsequent admission of the defendant's prior manslaughter conviction for purposes of impeachment; and, (3) the trial court's denial of the defendant's motion to strike the testimony of an eyewitness and its denial of the defendant's motion for mistrial. We find no error.

The information against the defendant arose from the following incident: Shaw rented one of two bedrooms in a house owned and occupied by Wilson, the person he assaulted. Off the kitchen of this house were doors leading to both bedrooms, to a bathroom, to the hallway, and to the back door— fire escape. Wilson called Shaw to the common area of the house; a discussion escalated to an argument and then a physical altercation; Wilson and Shaw each claimed that the other initiated the tussle. Wilson went to his bedroom and grabbed his .30-30 Winchester rifle with the intention, as he testified, to order Shaw to leave; Shaw went to his bedroom and got his .22 revolver. Weapons in hand, they both entered the kitchen from their respective bedrooms. The defendant, Shaw, fired five or six shots hitting Wilson three times.

## I

### JURY CHARGE ON SELF-DEFENSE

In his written request to charge the defendant requested the trial court to instruct the jury, in relevant part, that "[i]f James Shaw actually believed and had reasonable grounds to believe that Andrew Wilson was using or about to use physical force or was inflicting or about to inflict great bodily harm on him, and that deadly physical force was necessary to repel such danger, James Shaw was

not required to retreat or to consider whether he could safely retreat. He was entitled to stand his ground and to use such force as was reasonably necessary under the circumstances to save his life or to protect himself or others from serious bodily harm.

"I should note that the claim of self-defense is not necessarily defeated if greater force than would have seemed necessary in retrospect was used by James Shaw in the heat of passion generated by an assault upon him. A belief which may be unreasonable in retrospect may be actually and reasonably entertained in the heat of passion. For example, there was testimony here that both James Shaw and Andrew Wilson were engaged in a verbal and physical argument prior to the display of any weapons.

"I wish to emphasize that the laws of the State of Connecticut do not require an individual to retreat to avoid the use of deadly physical force if he is attacked in his own dwelling. There was testimony, for example, in this case, that James Shaw resided at 192 Cedar Street and was a legal tenant of that premises."

The trial court, however, in its instructions to the jury on self-defense did not charge as requested that the defendant had no duty to retreat in his dwelling and that greater-than-necessary force may be employed when in the heat of passion; but, instead, it instructed the jury on self-defense as follows: "Now, just what is self-defense, which the State must disprove here? Well, you, of course, heard all of the evidence, and our statutes recognize that a person can use force in defending himself, and one section of our statutes reads as follows: 'A person is justified in using reasonable physical

force upon another person to defend himself, or a third person, from what he reasonably believes to be the use of imminent—the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose, except that deadly physical force may not be used unless the actor reasonably believes that such other person is using or about to use, deadly physical force, or inflicting, or about to inflict, great bodily harm.'

"Now, regardless of those provisions that I just read to you, a person is not justified in using a deadly—in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety by retreating, except that the actor shall not be required to retreat if he is in his dwelling.

"Now, at this point, I would call your attention to the testimony that would indicate that, according to another statutory definition, both Mr. Wilson and Mr. Shaw were in their dwelling. Now, I just don't think that that statute was meant to give them the right, both of them, to refuse to retreat. It would seem to me, where both parties are in their dwelling, retreat must be considered in connection with the question of self-defense. How much force is necessary? Retreat can be taken in a physical way. It can also be taken to mean desist. Here it, apparently, means physically removing yourself from the premises, but it involved also, in this use of force, the idea of desisting when the degree of force you have been using, is no longer necessary.

"Now, from these statutes that I just read to you, you can conclude that a man, who is being assaulted, or who reasonably believes he is about to be

assaulted, may use such force in such a degree as he reasonably believes is necessary for his defense. The moment he steps over the line and uses more force than he reasonably believes is necessary, then he becomes a wrong doer and becomes guilty of a crime, himself. The test is not what force was actually necessary to protect himself from the user or imminent user of force, but rather the test is what force did he, acting as a reasonable man, believe to be necessary under the circumstances; and, of course, the State has the burden of proving that such force or violence, as you may find he used, was not justified. The State has that burden, the burden of disproving self-defense.

"Now, this means then that in determining whether or not excessive force was used, we do not have a hindsight proposition. The question is what did Mr. Shaw reasonably believe was necessary under the circumstances as you may find they presented themselves to him."

General Statutes § 53a-19[1] governs the degree of force which a person is justified in using to defend his person. One may use "deadly physical force"

---

[1] "[General Statutes] Sec. 53a-19. USE OF PHYSICAL FORCE IN DEFENSE OF PERSON. (a) Except as provided in subsections (b) and (c) a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a), a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section

to defend against another person whom one "reasonably believes" is "(1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm." General Statutes § 53a-19 (a). Nevertheless, "a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling . . . and was not the initial aggressor . . . ." General Statutes § 53a-19 (b). Both Wilson and Shaw appeared in the kitchen with loaded firearms capable of inflicting deadly physical harm. There was conflicting testimony as to who was the "initial aggressor." Even if the jury found Shaw to be the initial aggressor, it could not have imposed on him a duty to retreat because the trial court omitted that portion of the statute from its instruction to the jury; and, therefore, in that respect the defendant received a more favorable instruction than he was entitled to receive. The building within which the shooting occurred is clearly a dwelling. It is undisputed that the dwelling was owned by Wilson and that Wilson lived in

53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a), a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

the second floor apartment. Wilson rented the spare bedroom in his second floor apartment to Shaw, and Shaw was living there at the time of the assault. From the evidence presented the jury reasonably could have found that Shaw had the right to share the use of the kitchen and thus was in "his dwelling" when the shots were fired. Also, the trial court in its charge on self-defense commented to the jury that the testimony would indicate that both Wilson and Shaw were in their dwelling.

The question before us is whether General Statutes § 53a-19 imposes a duty to retreat upon a person in his dwelling when threatened by another person who also dwells in the same place. We have not addressed this question since the codification of the self-defense principle. The statutes which enumerate the situations where the use of force is justified "attempt to restate the common law. They should be read in the light of their common law background, and the fact that an individual section does not fully state the relevant common law rule, with all its possible applications, exceptions or implications, should not prevent a court from reading it as incorporating the full body of common law rules relevant thereto." Commission to Revise the Criminal Statutes, Connecticut Penal Code Comments 5-6 (1972).

Precodification Connecticut precedent supports the view that a lodger has a duty to retreat from common areas of the dwelling as against his resident landlord. *State* v. *Johnson,* 139 Conn. 89, 90 A.2d 905 (1952). In *State* v. *Johnson,* the defendant was living in the basement of the house of his landlord, the victim. He and his landlord quarreled in the yard of the property regarding the land-

lord's order that he should move out. The landlord swung a two-by-four, and the defendant hit and killed him with a hammer. The defendant claimed that the trial court erred in failing to charge that there was no duty to retreat in one's dwelling, but we rejected that claim, stating: "[T]he fight took place, not in the basement of the house [where the defendant lived], but in the yard, where the deceased had a right to be. The general charge on self defense fully covered this claim." Id., 94. More than seventy years ago Connecticut courts included in their jury instructions the concept of a duty to retreat even in one's dwelling-house or one's place of business. *State* v. *Bissonnette,* 83 Conn. 261, 268, 76 A. 288 (1910) (error in a charge imposing a duty to retreat because the charge did not sufficiently address the defendant's claim that the victim who was the defendant's brother-in-law entered the defendant's home wrongfully rather than upon invitation); *State* v. *Bailey,* 79 Conn. 589, 598–99, 602, 65 A. 951 (1907) (no error in a charge requiring retreat, if possible, in one's place of business).

When faced with the problem of violence between two persons entitled to occupancy of the same dwelling, American jurisdictions have gone both ways on the issue of a duty to retreat. The majority of jurisdictions have adopted the rule that there is no difference created by the status of the assailant: there is no duty to retreat in one's dwelling whether one's assailant be an intruder or a codweller.

Courts that have adopted this rule have done so for want of a reason for a distinction, and state the rule without more, e.g.: "Why, it may be inquired, should one retreat from his own house . . . when assailed by a stranger who is lawfully upon the

premises? Whither shall he flee, and how far, and when may he be permitted to return? He has a lawful right to be and remain there, and the legal nature and value of this right is not abrogated by its enjoyment in connection with another. . . . It is our opinion that the doctrine of retreat, or of declining combat by retreat, has no application to cases of this character . . . ." *Jones* v. *State,* 76 Ala. 8, 16 (1884); see also *State* v. *Phillips,* 38 Del. 24, 187 A. 721 (Oyer & Terminer 1936); *State* v. *Leeper,* 199 Iowa 432, 200 N.W. 732 (1925); *People* v. *Lenkevich,* 394 Mich. 117, 229 N.W.2d 298 (1975); *State* v. *Grierson,* 96 N.H. 36, 69 A.2d 851 (1950); *People* v. *Tomlins,* 213 N.Y. 240, 107 N.E. 496 (1914); *State* v. *Marlowe,* 112 S.E. 921 (S.C. 1922).

"The rationale behind the no-retreat jurisdictions . . . was inherited from those periods when retreat from one's dwelling was necessarily attended with increased peril. In a civilized country a person's leaving his dwelling does not automatically ordain that he is forsaking a place of safety for one wrought with danger." Note, "Criminal Law—A Further Erosion of the Retreat Rule in North Carolina," 12 Wake Forest L. Rev. 1093, 1100 (1976). Yes, times have changed; the world is different. The ancient sampler that a man's house is his castle has frayed a bit under the American experience. "There are no castles in America." Comment, "Is a House a Castle?" 9 Conn. L. Rev. 110, 111 (1976). The cases "which decline to hold that one may use deadly force in defense of the home per se, while at the same time espousing castle rhetoric, are a comment upon a dual aspect of the American character—the exceptional mobility of our society juxtaposed with the longing for a secure haven in the world. The result is an ambiguous concept of home which is

not entirely supportive of the castle doctrine. . . . Whatever appeal the old maxim may have, a House is not a Castle in America." Id., 128, 135.

In recognition of the demise of the solitary fortress and the great value of human life the drafters of the Restatement (Second) of Torts have adopted the minority view. "The privilege [to defend oneself against another by force intended or likely to cause death or serious bodily harm] exists although the actor correctly or reasonably believes that he can safely avoid the necessity of so defending himself by (a) retreating if he is attacked within his *dwelling place, which is not also the dwelling place of the other* . . . . The privilege . . . does not exist . . . *in a place which is also the dwelling of the other* . . . ." (Emphasis added.) Restatement (Second), Torts (1965) § 65.

We adopt the codweller retreat rule set forth by the Restatement. A minority of jurisdictions have long recognized it. E.g., *Oney* v. *Commonwealth,* 225 Ky. 590, 9 S.W.2d 723 (1928); *Commonwealth* v. *Johnson,* 213 Pa. 432, 62 A. 1064 (1906). This rule is in line with a policy favoring human life over the burden of retreating from the home, and the usual self-defense principles would still apply to allow defense at the wall or where retreat is impossible. In the great majority of homicides the killer and the victim are relatives or close acquaintances. Edwards, "Murder and Gun Control," 18 Wayne L. Rev. 1335 (1972). We cannot conclude that the Connecticut legislature intended to sanction the reenactment of the climactic scene from "High Noon" in the familial kitchens of this state. The trial court did not err in not giving the defendant's requested instruction that he had no duty to retreat from his codweller even if he could safely do so.

The defendant also claims error in the trial court's refusal to give a requested self-defense in the "heat of passion" charge. A comparison of the language of the instruction which was given with the language of General Statutes § 53a-19 demonstrates that the trial court's charge was "correct in the law, adapted to the issues and sufficient to guide the jury." *State* v. *Cooper,* 182 Conn. 207, 211, 438 A.2d 418 (1980).

## II

### USE OF PRIOR CONVICTION

The trial court denied the defendant's motion in limine, by which the defendant had sought an order preventing the prosecution from offering into evidence testimony of the defendant's prior conviction for manslaughter. The defendant claims this as error. We disagree.

At common law conviction of a crime disqualified one from being a witness. The legislature removed that bar with this provision: "No person shall be disqualified as a witness in any action by reason . . . of his conviction of crime; but such . . . conviction may be shown for the purpose of affecting his credit." General Statutes § 52-145. "It is well established that the credibility of a witness may be impeached by proof of prior convictions of crimes for which imprisonment may be more than one year." *State* v. *Townsend,* 167 Conn. 539, 563, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975); *State* v. *Bitting,* 162 Conn. 1, 8-9, 291 A.2d 240 (1971); *State* v. *Marquez,* 160 Conn. 47, 273 A.2d 689 (1970); see *Heating Acceptance Corporation* v. *Patterson,* 152 Conn. 467, 469-73, 208 A.2d 341 (1965), where we reexamined and modified the rule in *Drazen* v. *New Haven Taxi-*

*cab Co.,* 95 Conn. 500, 508, 111 A. 861 (1920).  Tait & LaPlante, Handbook of Connecticut Evidence (1976) § 7.21.

"The trial court's decision to deny the motion to exclude a witness' prior record when offered to attack his credibility will be upset only if the court abused its discretion.  In determining whether there has been an abuse, the ultimate issue is whether the court could reasonably conclude as it did." *State* v. *Bitting,* supra, 10–11.  No details of the manslaughter were admitted; the court gave an instruction cautioning the jury to consider the prior conviction only in judging the defendant's credibility, not in determining guilt.[2]  The trial court did not abuse its discretion.

## III

### Lost Evidence

Mary Baker, a friend of Wilson, lived in Wilson's house.  She was a witness to the shooting and the

---

[2] The court stated:

"Now, I want you to listen very carefully to this.  There was evidence produced that Mr. Shaw was convicted of manslaughter in 1972.  Now, no one told you what the underlying circumstances of that conviction were.  As a matter of fact, no one told me, either, and the reason you were not told is because it is not in any way evidence of guilt in this case.  All you can do with that evidence, I charge you, is to consider it in connection with his credibility.  Our law allows conviction of that, of that type of offense, to be used in attempting to discredit a witness.

"Now, you don't have to discredit him.  You decide just whatever—put it to whatever use you want to put it and you can consider the nature of the thing.  You know, it may be that a conviction of larceny might have more of an influence in your mind, on a question of credibility, than a conviction of manslaughter, so you don't know how that manslaughter came about; you don't know what instrumentality was used, you have no knowledge of it, and that was deliberately done because your only consideration of that is to determine whether or not you believe Mr. Shaw and credit any part or all of his testimony."

police tape recorded her statement on the day after the incident. This statement was not properly recorded, or not transcribed, or, if transcribed, was lost. A second statement, which was provided to defense counsel during the trial, was taken from her a month and a half after the assault. She testified at trial and was cross-examined.

The defendant moved pursuant to Practice Book § 2166 (now § 755)[3] to strike Mary Baker's testimony or to declare a mistrial because the state had elected "not to comply with an order of the judicial authority" under Practice Book § 2163 (now § 752)[4] "to produce any statement of the witness in the possession of the state or its agents . . . which statement relates to the subject matter about which the witness has testified." The defendant claims denial of these motions as error and also that failure to produce the statement has denied him his rights of confrontation and due process.

The trial court did not err in denying the defendant's motion to strike and motion for mistrial. Practice Book § 752 is patterned on the federal

---

[3] "[Practice Book] Sec. 755. —— ——FAILURE TO COMPLY WITH ORDER. If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in his discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

[4] "[Practice Book] Sec. 752. —— ——PRODUCTION FOLLOWING TESTIMONY. After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

Jencks Act, 18 U.S.C. § 3500 (1976). See Parley & White, "Expanding Criminal Discovery: Law and Tactics Under Public Act 680 of the Connecticut General Statutes," 44 Conn. B.J. 335 (1970). Because there are no Connecticut cases interpreting Practice Book § 755, we look to the federal cases interpreting the federal act. These hold that there is no error in the denial of a motion under this section where the statement sought to be produced has been innocently lost, the test being this: "Whether or not sanctions for nondisclosure should be imposed depends in large measure upon the extent of the Government's culpability for failure to make disclosable material available to the defense, on the one hand, weighed against the amount of prejudice to the defense which resulted, on the other." *United States* v. *Miranda,* 526 F.2d 1319, 1324 (2d Cir. 1975), cert. denied, 429 U.S. 821, 97 S. Ct. 69, 50 L. Ed. 2d 82 (1976). Applying a balancing test, the United States Court of Appeals for the Second Circuit held that the trial court's ruling denying the defendant's motion to suppress the testimony of a witness because a tape recording of a conversation between her and the defendant had been lost was not reversible error, for that would be a heavy sanction to the government for loss of a piece of evidence on which there was other primary evidence. Id. In *United States* v. *Perry,* 471 F.2d 1057 (D.C. Cir. 1972), the court recognized that this balancing approach gives broad discretion to the trial court. Id., 1068.

It appears that the unavailability of the statement in question was unintentional and the potential prejudice to the defendant was slight. The defendant had the second tape; Mary Baker and Detective Clarence Huff of the New Haven police

department testified that the two statements were essentially the same; and, further, the defendant had the opportunity to cross-examine the witness. On balance, the trial court did not err in denying both the motion to strike and the motion for mistrial.

The defendant also claims that the unavailability of the first statement deprived him of his confrontation and due process rights. The core of the right of confrontation is the opportunity to cross-examine the person who is providing the evidence. The defendant had this opportunity and used it. In *State* v. *Burns,* 173 Conn. 317, 377 A.2d 1082 (1977), clothing and hair samples were lost but a toxicologist's report was admitted: "[E]ven where the state fails to produce the physical evidence which is the subject of the witness' testimony, the right of confrontation is satisfied by an opportunity for full cross-examination. *United States* v. *Herndon,* 536 F.2d 1027, 1029 (5th Cir. [1976])." (Additional citations omitted). Id., 324. [T]he requirements of due process appear to have been met. There has been no showing that access to the lost evidence would have materially aided Burns' defense." Id., 325; *State* v. *Harden,* 175 Conn. 315, 327, 398 A.2d 1169 (1978). Here, also, the defendant has failed to show that his defense would have been materially aided by access to the tape recording of the first police interview with Mary Baker. There was no violation of the defendant's confrontation and due process rights.

There is no error.

In this opinion PETERS and ARMENTANO, Js., concurred.

BOGDANSKI, C. J. (dissenting). I do not dispute the wisdom of the exception that the court adds to the statutory "no retreat" rule. I note, however, that "as far back as 1821 this court held that penal statutes must be . . . 'expounded strictly against an offender, and liberally in his favor. . . . In extension of the letter of the law, nothing may be assumed by implication; nor may the mischief *intended* to be prevented or redressed, as against the offender, be regarded in its construction. It was the object of the principle, to establish a certain rule, by conformity to which mankind should be safe, and the discretion of the judge limited. . . .' *Daggett* v. *State,* 4 Conn. 60, 63 [1821]." *State* v. *Faatz,* 83 Conn. 300, 302–303, 76 A. 295 (1910); *State* v. *Cataudella,* 159 Conn. 544, 555, 271 A.2d 99 (1970); *State* v. *Parker,* 112 Conn. 39, 46, 151 A. 325 (1930); *State* v. *Penner,* 85 Conn. 481, 484, 83 A. 625 (1912).

General Statutes § 53a-19 (b) (1) recognizes only one exception to the rule that a person, in his dwelling, need not retreat before resorting to a deadly physical defense in a reasonable belief that another person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm. That exception denies the benefit of the rule to an initial aggressor. General Statutes § 53a-19 (b) (1). Today the court adds a second exception to the rule and thereby makes criminal the failure to retreat in one's dwelling before resorting to deadly physical force in self-defense against the use of deadly physical force or the infliction of great bodily harm by an initial aggressor who happens to be a co-occupant of the dwelling. Such an act is not encompassed by the plain mean-

ing of the penal code. The court justifies this addition by finding the second exception in our prior case law. An examination of the cases cited in the opinion reveals no such exception. The only case which arguably deals with the problem before us is *State* v. *Johnson,* 139 Conn. 89, 94, 90 A.2d 905 (1952). Although ambiguous, the statement from *Johnson* quoted by the court, when placed in its original context, merely distinguishes the yard from the defendant's dwelling. Thus, we denied Johnson a "no retreat" instruction because of the place where the incident occurred not because of the identity of the coparticipant. Because there is no such case law, adoption of the new exception abandons the rule of strict construction and violates the constitutional guarantee of due process by making the defendant's conduct criminal without having given him a reasonable opportunity to know that it was prohibited and to act accordingly. *State* v. *Chetcuti,* 173 Conn. 165, 167, 377 A.2d 263 (1977); *State* v. *Cataudella,* supra, 556.

Furthermore General Statutes § 53a-19 (b) (1) is based on comparable provisions of the New York Penal Code and the Model Penal Code. The commentary to the comparable section of the Model Penal Code states: "The Institute voted not to require retreat from the actor's dwelling when he is assailed by another person whose dwelling it also is . . . ." Model Penal Code, § 3.04 (2) (b) (ii) (1) (Proposed Official Draft 1962) p. 49. In view of the plain language and the derivation of § 53a-19 (b) (1), I believe that the majority usurps the legislature's authority by rejecting the statute's limitation on the retreat doctrine. See *State* v.

*Clemente,* 166 Conn. 501, 509–10, 353 A.2d 723 (1974) ; *Consolidated Diesel Electric Corporation* v. *Stamford,* 156 Conn. 33, 39, 238 A.2d 410 (1968).

Because the court's self-defense instruction was erroneous, I would order a new trial.

In this opinion HEALEY, J., concurred.