497 So.2d 1233 (1986)
PAYTON HEALTH CARE FACILITIES, INC., a Foreign Corporation Doing Business in Florida, Appellant,
v.
ESTATE OF Morris Hugo CAMPBELL, by and through Its Personal Representative, Morris Hugo Campbell, Jr., for and On Behalf of the Estate and the Survivor, Pollie Louise CAMPBELL, Appellees.
SOUTHEASTERN HEALTH CARE, INC., a Foreign Corporation Doing Business in Florida, Appellant,
v.
ESTATE OF Morris Hugo CAMPBELL, by and through Its Personal Representative, Morris Hugo CAMPBELL, Jr., for and On Behalf of the Estate and the Survivor, Pollie Louise CAMPBELL, Appellees.
Nos. 85-560, 85-588.
District Court of Appeal of Florida, Second District.
July 30, 1986.
*1234 Kenneth D. Morse, of Matthias, DeLancett, Morse & Robb, Orlando, for appellant, Payton Health Care Facilities, Inc.
Glenn Waddell of Waddell & Ready, P.A., Auburndale, Daniel P. Mitchell and C. Todd Alley, of Mitchell, Alley, Rywant and *1235 Vessel, P.A., Tampa, for appellant Southeastern Health Care, Inc.
Kenneth L. Connor, of Gibson, Connor, Lilly & Dodson, Lake Wales, and Gary W. Barrick, Lakeland, for appellees.
CAMPBELL, Acting Chief Judge.
Appellants, Payton Health Care Facilities, Inc. (hereinafter referred to as "Payton") and Southeastern Health Care, Inc. (hereinafter referred to as "Southeastern"), separately appeal from a final judgment entered against them as a result of a jury verdict. The separate appeals were consolidated and this opinion is dispositive of the consolidated appeals. We affirm.
Appellees are the Estate of Morris Hugo Campbell, by and through its personal representative, Morris Hugo Campbell, Jr. (hereinafter referred to as "Appellee Estate") and Pollie Louise Campbell, the surviving spouse of Morris Hugo Campbell (hereinafter referred to as "Appellee Spouse").
Appellees alleged a wrongful death action on behalf of both Appellee Estate and Appellee Spouse. This claim arose out of the alleged negligent treatment and care of the deceased while he was a patient at the Lakeland Health Care Center. This facility was owned by Payton and operated and managed by Payton, together with Southeastern as Payton's managing agent pursuant to a nursing home consultant and management services agreement between appellants. Payton was the licensee. It was further alleged that Appellee Spouse had employed the services of the treating physician to render medical care to the deceased while he was a patient at the nursing home. Appellees sought actual and punitive damages.
Immediately prior to trial, the treating physician settled the claims against him for the sum of $50,000. The matter then proceeded to trial. The jury returned a verdict in the sum of $8,958.15 in compensatory damages for Appellee Estate, and $500,000 in compensatory damages for Appellee Spouse, as survivor of the deceased. The verdict further assessed on behalf of Appellee Estate and Appellee Spouse, punitive damages in the amount of $900,000 against Southeastern and $800,000 against Payton. In entering final judgment, the trial judge deducted the $50,000 settlement by the treating physician from the compensatory damages awarded to Appellee Spouse. Since the jury rendered a verdict in favor of appellees, we interpret all issues of disputed fact in the light most favorable to appellees and supportive of the jury verdict.
On April 22, 1982, Morris Hugo Campbell, a stroke victim in need of medical and nursing care, was admitted to the Lakeland Health Care Center. At about the same time, Appellee Spouse employed the services of the private physician to render medical care to the deceased while he was a patient at the center.
While at the Lakeland Health Care Center, the deceased developed several severe decubitus skin ulcers which ultimately resulted in his hospitalization in Lakeland General Hospital on June 16, 1982. The deceased's condition at that time had deteriorated to such an extent that further treatment was inadequate to prolong his life. He died on June 27, 1982. The cause of death was determined to be bacteremia with sepsis, due to extensive infected necrotic decubitus ulcers. While the evidence presented to the jury revealed differences of opinion of several witnesses and some conflicting evidence, we conclude that the evidence was sufficient to sustain the verdict of the jury both as to compensatory and punitive damages.
Appellants raise seven issues on appeal. Two of the issues are directed to the sufficiency of the evidence and primarily focus on the award of punitive damages. Appellants' major emphasis, however, has been directed to procedural matters raised in the other five issues which they contend warrant a new trial.
Appellants first argue that the trial court erred in denying their motion for a continuance and in failing to grant Southeastern's motion to remove the cause from *1236 the jury trial docket. This issue caused us considerable concern and upon first consideration seemed to have merit. However, after a careful study of the record, including all of the pretrial proceedings, we conclude that no prejudicial error was committed by the trial judge in denying appellants' motions.
The trial was set for January 28, 1985, after appellants had requested and been granted an earlier continuance of the original December 1984 trial date. After the earlier continuance was granted, Judge Maloney, the original trial judge, rotated off of the case as the assigned judge and Judge Durrance was assigned and presided during the actual trial. From the record before us, it appears that Judge Durrance's first appearance in the case came at the pretrial conference on January 10, 1985.
At the pretrial conference, Mr. Stallings, who had been counsel for both appellants during the entire proceedings, moved to withdraw as counsel of record on the ground that appellants' liability insurance carrier had been forced into receivership. Mr. Stallings had been instructed by the carrier not to proceed any further in his representation of the insurance carrier. It was never contended before this court or the trial court that there was any effective stay order entered in any court involving the insurance company that would result in a stay of the proceedings. Mr. Stallings informed the trial judge that inasmuch as the liability carrier was possibly bankrupt, Payton and Southeastern had conflicting interests because of potential indemnity claims between them.
We find no merit in the argument that any conflict of interest between appellants occurred as a result of the possible bankruptcy of their liability carrier. There was always a possibility of substantial exposure on the part of both appellants regarding punitive damages. The jury, in fact, awarded punitive damages against each appellant. Since punitive damages were not covered by their insurance, the fact that the liability insurance carrier, by reason of its insolvency, no longer afforded protection to them, was not an incident that created for the first time a possibility of conflict of interest.
Based upon a study of the record, it appears to us that appellees made a stronger showing of possible prejudice on their behalf in the event a continuance was granted than did appellants in the event the motion for continuance was denied. A critical factor in our decision is the fact that Mr. Stallings, at the conclusion of the hearing, represented to Judge Durrance that he would offer to continue to represent both appellants if appellants so desired. At that point, Judge Durrance refused to continue the case and also refused to allow Mr. Stallings to withdraw.
It is significant that throughout the remainder of the proceedings Judge Durrance refused to allow Mr. Stallings to withdraw from the case and, in fact, Mr. Stallings continued to be present throughout all of the proceedings below. The trial judge was not sympathetic to appellants' position on the request for continuance since Mr. Stallings had represented both appellants throughout the proceedings and was available to represent them for the remainder of the proceedings. Disregarding Mr. Stallings' availability, appellants chose to retain additional private counsel.
During a telephone conference on January 24, 1985, four days prior to the trial date, appellants' newly retained counsel again requested Judge Durrance to continue the matter so that they could better prepare the case for their respective clients. Judge Durrance refused the request, ordered the parties to proceed to trial and again ordered Mr. Stallings to remain on the case.
We also find it significant that after the entry of private counsel, neither appellant changed the theory of their defense to any discernable degree. Throughout the course of the trial, their positions appeared to be compatible and harmonious. The conflict of interest issue simply did not materialize. Upon careful study of the record, it is clear that no prejudice occurred to appellants *1237 as a result of the refusal of their request for continuance.
The record reflects throughout the proceedings below that both Judge Maloney and Judge Durrance had a reasonable basis to conclude that appellants were not proceeding to trial with diligence. Beginning as early as August of 1984, hearings were held before Judge Maloney in an attempt to compel appellants to comply with discovery orders. In November, a notice of trial set the trial date for December 3, 1984, causing appellants to move for a continuance. The basis of that motion for continuance was that appellants were not ready to proceed to trial because they had not completed discovery. At the November 8, 1984 hearing on the motion for continuance, the attorney for the co-defendant/treating physician made these responses to appellants' motion:
Judge, I have no sympathy on a request for continuance in this case for this reason. Southeastern and Payton have done nothing to initiate any discovery. No interrogatories, no request to produce, no depositions. Mr. Trohn and I are the only ones who have taken any depositions in connection with this case... .
Secondly, in terms of the continuance and where we go from here so the Court is aware of it and aware of what's happened in respect to the discovery here, thus far none of the production that the Court previously ordered the nursing home to make has been made... .
... Nobody has anybody to blame but themselves and their clients if this case isn't in shape to try.
Despite the opposition of the treating physician/co-defendant and appellees, the trial judge continued the case until late January or early February but imposed limitations on the extent of future discovery. On January 3, 1985, there was another hearing before Judge Maloney wherein appellees sought to impose sanctions as a consequence of appellants' failure to comply with previous discovery orders and the order setting the pretrial conference.
Furthermore, appellees' counsel represented to the court at the time of appellants' final motions for continuance, that circumstances had changed drastically in regard to the ownership of the nursing home facilities. His concern was that such circumstances might severely prejudice appellees in their ability to collect any judgment that might be forthcoming. Appellees' counsel informed the court that the nursing home had been sold for a cash consideration, with a mortgage and a note securing the balance of the purchase price. Appellees feared that those assets were being dissipated at an alarming rate.
We thus conclude that there were sufficient factors before the trial judge to warrant his refusal to grant a further continuance. In reaching that conclusion, we began with the premise that a trial court has broad discretion in granting or denying a continuance. See Thompson v. General Motors Corp., Inc., 439 So.2d 1012 (Fla. 2d DCA 1983). We are not prepared, in the instant case, to hold that the trial judge abused that discretion. We find the factual circumstances in this case in regard to the continuance very similar to those of Edwards v. Pratt, 335 So.2d 597 (Fla. 3d DCA 1976). The court held in Edwards that a gross or flagrant abuse of discretion by a trial judge in granting or denying a motion of continuance must be demonstrated to warrant reversal. The primary thrust of the argument of the party requesting the continuance in Edwards was that newly retained local counsel needed additional time in which to prepare for the final hearing since a nonresident party had recently changed local counsel. It was significant to the court in Edwards that a previous continuance had been granted and that the previously retained counsel remained on the case throughout the entire proceedings so that there was continuity of representation for the appellant. That same situation exists here. Accordingly, we conclude that appellants' issue regarding the continuance and the failure to remove *1238 the case from the trial docket is without merit.
The second issue raised by appellants is that the trial judge erred in failing to disqualify himself. Appellants filed a motion to disqualify and an attached affidavit on the morning of trial. The trial judge, after consideration of the motion, ruled that the motion to disqualify was not timely filed, but further determined on the merits that the motion was insufficient on its face. While we would not agree that the motion was untimely under Florida Rule of Civil Procedure 1.432 had it been sufficient on its face, we need not decide that matter. Clearly, the motion was insufficient since it dealt solely with prejudice that was allegedly founded on the adverse rulings of the trial judge against appellants. Adverse judicial rulings are not a basis for disqualification of a judge for bias or prejudice. Wilson v. Renfroe, 91 So.2d 857 (Fla. 1957); State ex rel Locke v. Sandler, 156 Fla. 136, 23 So.2d 276 (1945); Claughton v. Claughton, 452 So.2d 1073 (Fla. 3d DCA 1984).
The third issue raised was whether the trial court erred in admitting into evidence a separate complaint in another action filed by Payton against Southeastern shortly before trial. This complaint contained allegations of negligence in regard to the treatment of the deceased. We conclude that the complaint was properly admitted by the trial court as an admission against interest. Fisher v. Guidy, 106 Fla. 94, 142 So. 818 (1932); Booth v. Lenox, 45 Fla. 191, 34 So. 566 (1903).
We do not consider appellants' fourth and sixth points raised on appeal to be of sufficient merit to warrant discussion. The fourth point pertains to alleged error by the trial court in failing to grant appellants' motion for mistrial when the trial judge inquired of counsel and their clients as to whether certain documents were available, or had been available, as demanded by a motion to produce filed on behalf of appellees. We have examined the record and conclude that there was no prejudice to the parties. Therefore, the denial of mistrial was proper.
The sixth issue raised by appellants concerns a request to add a name to the witness list. Apparently, the witness whom appellants sought to add was corporate counsel for one of the parties. Counsel, during oral argument before this court, acknowledged that no proffer was made to the trial court concerning the anticipated content or nature of the witness' testimony. Consequently, we are unable to determine that any prejudice occurred, more particularly, in light of the limitations on additional witnesses or discovery that Judge Maloney had earlier imposed.
The final two points raised by appellants can be considered together. Point five pertains to whether the record supports an award of punitive damages against either appellant. The seventh point concerns whether Payton could be held liable for the acts of Southeastern, regardless of whether Southeastern's acts were categorized as willful or wanton. Payton's position regarding its lack of liability is derived from its categorization of the relationship between Payton and Southeastern as employer and employee. We feel that the categorization of a pure employer/employee relationship is not supported by the evidence.
The first page of the nursing home consultant and management services agreement entered into by Payton and Southeastern provides that "OWNER is the owner of and intends to operate and/or expand a facility providing skilled nursing care... ." (Emphasis supplied.) Article II of the agreement provides that Southeastern will perform the services contracted for "in order to assist OWNER in its management and operation of the Nursing Home in accordance with applicable local, state and federal laws, rules and regulations." (Emphasis supplied.) Section 1 of Article II provides that Southeastern agrees to assist the owner so that "OWNER can maintain a high standard of patient care and service, and to assist OWNER in maintaining an efficient operation of the Nursing Home so as to meet all the requirements *1239 of applicable local, state and federal laws, rules and regulations relating to the operation of the Nursing Home." Section 1.2 of Article II provides that Southeastern's staff and consultants "will advise and assist OWNER in its operation as follows... ." Section 2 of Article II provides that Southeastern, among other things, would furnish the necessary forms and procedures "to be used by OWNER in its operation of the Nursing Home." Article III of the agreement is entitled, "OPERATION OF NURSING HOME BY OWNER," and provides as follows:
During the term of this agreement, OWNER shall own, (lease) and operate the Nursing Home, and provide skilled nursing care, intermediate nursing care, custodial care and other health services, at its sole expense. OWNER shall operate the Nursing Home, to the extent economically and legally possible, in accordance with applicable local, state and federal laws, rules and regulations. OWNER shall, at its own expense, obtain and maintain, during the term of this agreement, all necessary licenses and permits as may be required for the operation of the Nursing Home as a facility providing skilled nursing care, intermediate nursing care, custodial care and other health services.
OWNER at its expense shall provide the Nursing Home with the operating staff and personnel to meet the requirements established by applicable local, state and federal rules and regulations as to facilities, equipment, funds and resources necessary to maintain the permit and license which are necessary to continue operation of the Nursing Home.
OWNER, at its expense, agrees to apply for and maintain with reputable and financially sound insurance companies, adequate policies of insurance to insure itself against liability for injury or damage to person and property (including malpractice insurance), and such other policies, where it applies, the activities of SHC as required under this agreement, and to obtain an endorsement in favor of SHC on all of the above policies, and to supply SHC with a certificate of insurance to that effect.
OWNER shall cooperate with SHC in every respect and shall furnish SHC with all of the information required by it for the performance of SHC's services under this agreement, and shall permit SHC to examine and copy any data in possession and control of OWNER affecting the Nursing Home, and the providing of SHC's consultant services under this agreement.
The obligations of SHC shall be as specified in this agreement and OWNER agrees to be responsible for all operating costs, wages, salaries, expenses, fees, losses, taxes, etc. and OWNER agrees to fully indemnify and hold SHC harmless from any and all claims, obligations, debts, demands, losses, actions, liabilities, costs (including attorney fees), or damages, of every type and description which pertain to the operation of the Nursing Home.
Thus, we conclude that there was sufficient evidence before the jury upon which it could properly determine that the obligations and liabilities arising from the operation of the nursing home were mutual as to both Payton and Southeastern.
The final matter requiring consideration is whether there was sufficient evidence to sustain a finding of willful or wanton conduct necessary to affirm an award of punitive damages. We conclude that there was sufficient evidence. The specific verdict question, which the jury answered in the affirmative, was: "Do you find that Payton or Southeastern acted with wantonness, or willfulness, or reckless indifference to the rights of others in their care and treatment of Morris Hugo Campbell?"
Appellants cite Smith v. Brantley, 455 So.2d 1063 (Fla. 2d DCA 1984), Clooney v. Geeting, 352 So.2d 1216 (Fla. 2d DCA 1978) and Carraway v. Revell, 116 So.2d 16 (Fla. 1959) in support of the proposition that *1240 there must be evidence of willful and wanton disregard for the rights of others in order to give rise to an award of punitive damages. We concur with the principle of law for which those cases stand. We feel, however, that under the circumstance of this case there is sufficient evidence to meet that standard. We conclude that the type of evidence sufficient to meet that standard equates to the standard discussed by this court in Smith v. Telophase National Cremation Society, Inc., 471 So.2d 163 (Fla. 2d DCA 1985). Quoting from the Restatement (Second) of Torts § 46 at 73 (1965) in regard to the tort of intentional infliction of emotional distress, we stated:
Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
At the trial of this cause, appellees presented the testimony of a medical doctor who was qualified for the purpose of testifying as an expert in nursing home care. The physician's credentials were substantial and demonstrated that he had occupied a position of executive leadership in nursing home ventures. This expert examined the nursing home and hospital records pertaining to Mr. Campbell and testified at length about the deficiencies in the care of the deceased during his residency at the Lakeland Health Care Center. When asked his opinion as to how that standard of care compared to acceptable standards, he testified it was "an outrageous deviation from the acceptable standard." (Emphasis supplied.) We, therefore, conclude that the evidence was sufficient to sustain the award of punitive damages.
Accordingly, we affirm the final judgment of the trial court on all points.
SANDERLIN, J., concurs.
SCHOONOVER, J., concurs in result only.