STATE OF CONNECTICUT *v.* DONALD E. SANTANGELO
(12900)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and COVELLO, Js.

Argued October 8—decision released December 22, 1987

*William F. Gallagher,* with whom, on the brief, was *Robert P. Borquez,* for the appellant (defendant).

*Judith Rossi,* deputy assistant state's attorney, with whom, on the brief, were *Patrick Clifford* and *James G. Clark,* assistant state's attorneys, for the appellee (state).

CALLAHAN, J. The defendant, Donald Santangelo, was charged in an information with one count of the

crime of murder in violation of General Statutes § 53a-54a (a).[1] The charge arose from the brutal slaying of Jessie Carrano, a fifty year old New Haven woman whose body was found on September 13, 1984, partially concealed under a pile of debris, behind a factory building at 850 Sherman Avenue in Hamden. The woman's death was caused by multiple blows to the head with a blunt object which resulted in comminuted compound fractures of the skull and injuries to the brain. Her body also displayed a four inch incised wound under her chin caused by a sharp instrument, and other abrasions, lacerations and contusions. After a jury trial the defendant was convicted as charged and sentenced to a term of imprisonment of sixty years.

On appeal, the defendant claims that the trial court erred in: (1) denying his motion to recuse; (2) denying his motion to strike testimony of the victim's husband and daughter; (3) denying his motion to exclude certain statements made by the victim to her husband and daughter which he claims were inadmissible hearsay; (4) charging the jury; (5) denying his motion to disqualify itself .from sentencing; and (6) denying his motion of acquittal.

There was evidence to support and the jury could reasonably have found the following pertinent facts. The

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

victim first met the defendant at the Chatham Pharmacy in the Fair Haven section of New Haven on the morning of September 7, 1984, while both were waiting for prescriptions to be filled. At that time, the defendant told the victim that he was a cook at the Ramada Inn in North Haven and that he could procure a job interview for her at the inn. He wrote down the telephone number of the inn and the name of the manager on a piece of brown paper bag which he gave to the victim. In a later telephone call he told the victim that he had arranged an interview for Monday, September 10, at 7:30 p.m.

The victim spoke to her husband, James Carrano, and her daughter, Janice, several times during the next few days concerning her meeting with the defendant. On Monday afternoon, September 10, the victim informed Janice that she expected to meet "Don" at the Chatham Pharmacy that evening and accompany him to the job interview. The victim asked her daughter to come with her but Janice declined. Thereafter, using the telephone number on the scrap of paper bag, the victim telephoned the Ramada Inn and spoke to the manager. The manager informed the victim that he knew of no prearranged interview but that she could come to the inn and fill out a job application. Shortly after the victim had completed her call to the manager, her telephone rang and was answered by her daughter. The caller identified himself as "Don" and asked to speak to the victim. When she was handed the telephone, the victim told the caller, "Yes, I will meet you at the Chatham Pharmacy."

Later, the victim telephoned her husband at his job and told him that she intended to meet "Don" at the pharmacy at 6:50 p.m., leave her car and accompany him in his vehicle to the job interview. She also informed her husband that she would arrange to pick him up from work at about 8 p.m. after she had

returned from the interview. When he had not heard from his wife by 10 p.m., James Carrano called his son for a ride. Together they drove to the Chatham Pharmacy where they located the victim's parked automobile. James Carrano then went home and waited for his wife. When she did not appear during the next several hours he called the Ramada Inn twice, the last time at approximately 8 a.m. on September 11. At that time he talked to a cook who identified himself as "Don," who said he was from North Haven, did not know the victim, had never been in New Haven, and that he was unfamiliar with the location of the Chatham Pharmacy. Thereafter, James Carrano called the New Haven police department to report his wife missing.

The jury could also have found that the defendant was the only cook named "Don" employed at the Ramada Inn in North Haven, and that on September 10 he worked at the inn between the hours of 6 a.m. and 2 p.m. Later that day, at about 6 p.m., he borrowed the automobile of his girlfriend Carol Cacchillo, with whom he lived, and left their apartment purportedly to attend a menu meeting at the Ramada Inn. There was, however, no menu meeting scheduled at the inn for that evening. Between 7:30 and 8 p.m. on September 10, while driving Cacchillo's automobile, the defendant was involved in a one car accident on Sherman Avenue in Hamden. The accident occurred approximately eight-tenths of one mile from the site where the victim's body was later located. Cacchillo's car was rendered inoperable by the accident and had to be towed from the scene.

After the accident, the defendant told persons who later testified at the trial that he was unfamiliar with the neighborhood and that he was on his way home from work. He had, however, previously been employed in the immediate area and, as indicated above, had finished work at 2 p.m. that day. The defendant also

related conflicting versions of how the mishap occurred. The day following the accident three witnesses who knew the defendant saw him walking on Sherman Avenue toward the factory at the rear of which the victim's body was later discovered.

Pursuant to their investigation of the missing person's report concerning the victim, New Haven police officers on September 11 and 12, prior to discovery of the victim's body, interviewed her family, the staff at the Ramada Inn, Cacchillo and the defendant. At that time the defendant acknowledged meeting a woman whom he could not identify at the Chatham Pharmacy on September 7 and recalled that he might have given her his manager's name. He denied knowing the victim, however, or ever having been with her in Cacchillo's automobile. He admitted to the police that he had lied to Cacchillo about being required to attend a menu meeting in order to obtain the use of her car to meet a male friend named Terry. He said he had driven around in Hamden looking for Terry for about two hours prior to the accident.

A search of Cacchillo's automobile by New Haven police department personnel at the garage where it had been towed subsequent to the accident, disclosed a blood stain on the front seat. The stain was later analyzed as type A blood, the victim's blood type.[2] The victim's left thumb print was also found on the interior of the front passenger door window. An impression of the defendant's right index finger was later lifted from a piece of torn paper bag found in the victim's pocketbook which was located near her body.

[2] Cacchillo had not observed any bloodstain on the front seat prior to September 10. There was testimony, however, that her daughter, who had type A blood, had suffered an injury to her foot and had bled in the car some time in August.

## I

The defendant first argues that the trial court erred by denying his motion to recuse. The defendant claims, as the basis of his motion, that the trial court had actively participated in pretrial plea negotiations in his case and, consequently, disqualification was required. See *State* v. *Gradzik,* 193 Conn. 35, 47, 475 A.2d 269 (1984).

It is axiomatic that the burden of establishing a record that a judicial impropriety has occurred which demonstrates or gives the appearance of bias or partiality so as to require recusal rests with the party who claims the occurrence of such an impropriety. *State* v. *Lopez,* 197 Conn. 337, 348, 497 A.2d 390 (1985); *State* v. *Fullwood,* 194 Conn. 573, 581, 484 A.2d 435 (1984); *State* v. *Nash,* 149 Conn. 655, 658–59, 183 A.2d 275, cert. denied, 371 U.S. 868, 83 S. Ct. 130, 9 L. Ed. 2d 104 (1962). "In the absence of such a record, we have no basis for concluding that the trial judge's pretrial activities so impaired, or appeared to impair, his ability to act as a judicial officer or a neutral arbiter that it was error to deny the motion for disqualification." *State* v. *Fullwood,* supra.

We first note that the defendant, although he filed a written motion to recuse, has failed to follow the procedural requirements of Practice Book § 997.[3] Perusal of the record reveals that it contains neither an affidavit setting forth the facts upon which he relies for disqualification nor a certificate of counsel attesting to

---

[3] "[Practice Book] Sec. 997.—PROCEDURE

"A motion to disqualify a judicial authority shall be in writing and shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification and a certificate of the counsel of record that the motion is made in good faith. The motion shall be filed no less than ten days before the time the case is called for trial or hearing, unless good cause is shown for failure to file within such time."

the fact that the motion was made in good faith. Both are required procedural adjuncts to a motion to recuse a judicial authority. Practice Book § 997. Adherence to those procedures is necessary to obtain proper judicial review. *State* v. *Weber,* 6 Conn. App. 407, 412–13, 505 A.2d 1266, cert. denied, 199 Conn. 810, 508 A.2d 771 (1986). In view, however, of the serious consequences of the defendant's conviction and the fact that his claim goes to his fundamental constitutional right to a fair trial, we will review the available record despite its procedural deficiencies. *Papa* v. *New Haven Federation of Teachers,* 186 Conn. 725, 740, 444 A.2d 196 (1982); *State* v. *Evans,* 165 Conn. 61, 69–70, 327 A.2d 576 (1973).

In the absence of an affidavit or evidentiary hearing the available record consists only of a colloquy among the trial court, defense counsel and an assistant state's attorney. During the course of that colloquy defense counsel recounted his recollection of the part played by the trial court in pretrial proceedings relating to the defendant. Representations of counsel, however, are not evidence upon which we can rely in our review of the trial court's conduct. *State* v. *Watson,* 198 Conn. 598, 611, 504 A.2d 497 (1986); *State* v. *Weber,* supra, 413. Other than the representations of defense counsel, the record contains only the recollections of the assistant state's attorney and the trial court itself concerning any pretrial participation by the trial court in the defendant's case. Both indicate that the trial court's participation was minimal. Our review of the available record reveals that any contact by the trial court with the defendant's case clearly did not amount to active participation in plea negotiations.[4] See *State* v. *Gradzik,* supra, 47.

---

[4] Judge Hadden succinctly stated his recollection of the role he played in the "plea negotiations": "My recollection of the so-called 9:30 pretrial is in accord with Mr. Clifford's recollection. When I became presiding judge or acting presiding judge, whatever I was for six months, as cases came

Faced with the limited and contradictory record available, we cannot find that the defendant has presented this court with a record that mandates recusal. The trial court did not err in denying the defendant's motion.[5] *State* v. *Maluk,* 10 Conn. App. 422, 426, 523 A.2d 928 (1987).

## II

## A

The defendant next claims that the trial court erred by denying his motion to strike the testimony of both

on the 9:30 [a.m.] list that had previously been pretried, the first pretrial which is held at two o'clock with Judge Kinney, I looked in his books of notes to see what he had to say about the case. And it said it was a murder case. I think it made reference to Hamden. I think it made reference to the victim being found buried under rocks or something like that. I think it indicated that the defendant had a prior criminal record of some consequence. And Judge Kinney had written down, state wants fifty-five. And as he puts it down, 55 anos, which I gather is Spanish for years. And that's all it said.

"And when you came in, if you say you came in in February, I assume there was a 9:30 [a.m.] pretrial, whatever took place, I have no recollection of ever discussing the facts of this case. I don't know the facts of this case at this moment. When you say strengths and weaknesses, I don't know the strengths and weaknesses of this case. I don't think I ever opened that file until today. And when I do pretry cases and actively participate in them, even when I do not actively participate in the plea bargain negotiations, I make notes as to what takes place. And there are no notes in that notebook, which means that the pretrial, if you want to call it that, was along the lines of what Mr. Clifford had said. I looked at the thing, and there is a 55-year figure being mentioned by the state. I look at the defendant, are you interested? No. That's the end of it. It was at that point I think, Mr. Sweeney, you did indicate that you were engaged in some type of psychiatric investigation. I think it was at that time, but I'm not sure on that. But for sure, this court did not actively participate in the negotiations of a plea bargain, which is what you have to establish to show that I should be recused or excused from sitting on this case. I don't think there's any merit to this motion at all, not in the slightest.

"Therefore, your motion is denied."

[5] The defendant contends that because the trial court ruled adversely to him on two pretrial motions, subsequent to the denial of his motion to recuse, bias or its appearance was demonstrated. We disagree. *Hartford Savings & Loan Assn.* v. *Tucker,* 192 Conn. 1, 8, 469 A.2d 778 (1984); *Payton Health Care Facilities, Inc.* v. *Estate of Campbell,* 497 So. 2d 1233, 1238 (Fla. App. 1986).

James and Janice Carrano, the victim's husband and daughter. His motion with regard to James Carrano's testimony is based on his claim that he was prejudiced because of the destruction, by the New Haven police department, of the tape recording of Carrano's telephone call of September 11 reporting his wife's disappearance.

The tape, which was made somewhat less than three months after the release of our decision in the case of *State* v. *Myers,* 193 Conn. 457, 479 A.2d 199 (1984), was erased pursuant to a long-standing practice of the New Haven police department to erase and reuse tapes utilized in recording incoming calls for assistance. That practice, at least as of September 11, 1984, had apparently not been brought into compliance with *Myers* and Practice Book § 752.[6] *Myers* mandated the preservation of statements of potential witnesses that may be required to be produced and made available to the defense in a criminal trial. *State* v. *Myers,* supra, 468. Although, in view of the previous release of *Myers,* the destruction of the tape in this case may have been inexcusable, there is no allegation that it was destroyed maliciously or in bad faith to thwart the defense.[7] In the absence of bad faith we employ a balancing test to determine whether sanctions should be imposed for the state's failure to produce the tape. One possible sanction is the striking of the witnesses' testimony.

[6] "[Practice Book] Sec. 752.——PRODUCTION FOLLOWING TESTIMONY

"After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

[7] The trial court stated: "Intentionally destroyed, yes, but not intentionally destroyed to deprive counsel in this case or the defendant in this case from access."

Practice Book § 755.[8] The balancing test weighs the culpability of the state for its failure to make disclosable material available on the one hand, against any resulting prejudice to the defendant on the other. *State v. Myers*, supra, 467, 469; *State v. Shaw*, 185 Conn. 372, 386, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982).

It is evident from a review of the transcript of his testimony that Carrano's telephone call was a routine call wherein he reported that his wife had been missing since the previous evening and asked that an officer be sent to his home so that he could make an official report.[9] Carrano testified to that effect and indicated that he did not recall saying anything else. Indeed, it is difficult to imagine what more he could have or would have said under the circumstances. In view of the apparently routine nature of the call, the short period that had elapsed since *Myers,* the availability of the police report concerning the subject of the call and the fact that the crime to which the call collaterally related was in the jurisdiction of the Hamden police department, we do not believe that the failure of the New Haven police to preserve the tapes of the telephone call required the trial court to impose sanctions unless the defendant demonstrated a realistic possibility of prejudice. Although his brief contains the conclusory statement that "the state's failure to produce said recording

[8] "[Practice Book] Sec. 755.——FAILURE TO COMPLY WITH ORDER

"If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in his discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

[9] Officer Arthur Granucci of the New Haven police department was sent to the Carrano home the morning of September 11 and spoke to James Carrano on the front porch for approximately ten or fifteen minutes. Granucci's report was made available to the defense.

prejudiced him in that it deprived him of an essential tool for cross-examination," nowhere does the defendant divulge what might possibly have been unearthed with that "tool" or how he was possibly prejudiced. The trial court has broad discretion in applying the balancing test set forth in *Shaw* and *Myers*. *State* v. *Mullings,* 202 Conn. 1, 10, 519 A.2d 58 (1987). Under the circumstances it did not abuse that discretion in refusing to strike James Carrano's testimony.

B

The defendant also claims that the trial court erred by denying his motion to strike the testimony of Janice Carrano, the victim's daughter.

On September 20, 1984, Janice gave a tape recorded statement to the Hamden police department. A three page typed transcription was later made of her recorded statement. The transcription was reviewed and signed by her on September 25. Thereafter, the tape was erased or destroyed and, consequently, was not available to the defendant at the time of trial. The defendant claims he was prejudiced by not having access to Janice Carrano's original recorded statement because its loss damaged his ability to cross-examine her effectively. The state did turn over to the defendant the typed transcription of her recorded statement.

As in *State* v. *Mullings,* supra, the investigation in this case was conducted after the date of this court's decision in *State* v. *Myers,* supra, but prior to our decision in *State* v. *Milum,* 197 Conn. 602, 500 A.2d 555 (1985). In *Milum,* we expressed our concern over the routine destruction of potentially discoverable taped statements even after a typed transcription is made. Id., 617. In *Milum,* we indicated that a " 'course of conduct is not necessarily reasonable merely because it is routine. . . .' *United States* v. *Carrasco,* 537 F.2d 372, 376 (9th Cir. 1976) . . . ." Id. In *Mullings,* however,

we agreed with the state that prior to our decision in *Milum* "the erasure of the tape after a verbatim transcript had been made was consistent with a reasonable, though in hindsight erroneous, interpretation of *Myers.*" *State* v. *Mullings,* supra, 9. We held, therefore, that prior to *Milum* the routine destruction of a tape after a verbatim transcript had been made could not be viewed as having been done in bad faith. Id., 9–10.

Absent bad faith we employ the balancing test set forth in *State* v. *Shaw,* supra, and *State* v. *Myers,* supra, to determine whether the trial court erred in refusing to strike Janice Carrano's testimony. *State* v. *Milum,* supra. As previously indicated, that test weighs the extent of the state's culpability for nondisclosure against the amount of prejudice demonstrated by the defendant. *State* v. *Mullings,* supra, 10; *State* v. *Myers,* supra, 467. Although the loss of the taped statement by the police is not excusable, our decision in *Myers* makes it understandable and reduces the state's culpability to a minimum. The question, therefore, is what prejudice, if any, the defendant suffered as a result of the unavailability of the tape.

A review of the transcription of Janice Carrano's taped statement and her voir dire testimony reveals that the defendant's argument that he was prejudiced by the loss of the tape lacks merit. Janice testified on voir dire that she believed the words in the transcription were the same as those used in her taped statement. Unfortunately, two words in the three page transcription are typed over and difficult to read. It is on these two words that the defendant bases his argument. One word, commencing with the letter "T" in the context of the sentence in which it is used, is obviously the word "Town." Janice testified that she meant to and believed she used the word "Town" in that sentence. The other word on the page of her statement

appears to be the word "was" and she thought that to be what she had said. At any rate, the loss of the two words in the three page transcription did not substantially impair whatever usefulness it might have had for purpose of cross-examination.[10] The trial court, in denying the motion to strike Janice Carrano's testimony, did not abuse its broad discretion when it found the loss of the tape was "unintentional" and had resulted in "absolutely no prejudice to the defendant." *State* v. *Mullings,* supra, 10-11; *State* v. *Shaw,* supra, 386.

## III

The defendant next claims it was error for the trial court to admit, over his objection, testimony of the victim's husband and daughter relating to conversations they had with the victim concerning her intention to meet "Don" at the Chatham Pharmacy on September 10 and accompany him to a job interview. He also claims the trial court erred by denying his motion in limine and by overruling his objections to testimony of the victim's husband and daughter relating to conversations they had with the victim concerning her first meeting with the defendant at the Chatham Pharmacy on September 7.

The defendant concedes that the victim's statements indicating her intention to do a particular act in the immediate future, made in apparent good faith and not for self-serving purposes, were admissible as an exception to the hearsay rule, to prove that the act was in fact performed. See *State* v. *Journey,* 115 Conn. 344, 351, 161 A. 515 (1932). He contends, however, that her

---

[10] The cross-examination of Janice Carrano was relatively short and barely touched on her statement of September 20 to the Hamden police. The concentration during cross-examination appears rather to have been on what information she had given to Detective Leonard Pastore of the New Haven police department over a week earlier.

statements that she was going to meet "Don" pertain, not only to her intention, but to those of another person, i.e., "Don." He argues, therefore, that the victim's husband and daughter should not have been allowed to testify as to whom the victim said she was to meet, because for that purpose her statements were inadmissible hearsay. We are unpersuaded.

The hearsay statements of an unavailable declarant, made in good faith and not for a self-serving purpose, that express his or her present intentions to meet with another person in the immediate future are admissible and allow the trier of fact reasonably to infer that the declarant's expressed intention was carried out. *Mutual Life Ins. Co.* v. *Hillmon,* 145 U.S. 285, 295–96, 12 S. Ct. 909, 36 L. Ed. 706 (1892); *United States* v. *Pheaster,* 544 F.2d 353, 377–80 (9th Cir. 1976), cert. denied sub nom. *Inciso* v. *United States,* 429 U.S. 1099, 97 S. Ct. 1118, 51 L. Ed. 2d 546 (1977); *People* v. *Alcalde,* 24 Cal. 2d 177, 186, 148 P.2d 627 (1944); *Hunter* v. *State,* 40 N.J.L. 495, 534, 536, 538 (1878); *State* v. *Vestal,* 278 N.C. 561, 585–86, 180 S.E.2d 755 (1971), cert. denied, 414 U.S. 874, 94 S. Ct. 157, 38 L. Ed. 2d 114 (1973); C. McCormick, Evidence (3d Ed.) § 295, p. 848. "Applying this rule to the evidence in question, most of the statements made by the deceased to his wife related to his then *present intention to go to New Haven to meet the defendants and were admissible.*" (Emphasis added.) *State* v. *Perelli,* 125 Conn. 321, 325, 5 A.2d 705 (1939). The trial court did not err, therefore, by allowing into evidence testimony by James and Janice Carrano concerning statements made to them by the victim that she intended to meet "Don" at the Chatham Pharmacy on September 10.

The defendant also claims that the trial court erred by allowing the victim's husband and daughter to testify to what they were told by the victim concerning

the circumstances of her meeting with the defendant at the Chatham Pharmacy on September 7 and of his offer and purported efforts to aid her in obtaining employment at the Ramada Inn. The defendant argues that these statements do not fall within any recognized exception to the hearsay rule and are inadmissible. We disagree.

It would be incongruous to allow evidence of the victim's expression of a future plan or intention and exclude evidence of a contemporaneous explanation of the reasons that prompted it. To hold that the victim's statements that she was going to meet "Don" at the Chatham Pharmacy are sufficiently trustworthy for the jury to consider without confrontation, but that her references to her September 7 meeting and her conversations with the defendant that produced her intention are not, is illogical. *United States* v. *Annunziato,* 293 F.2d 373, 377–78, cert. denied, 368 U.S. 919, 82 S. Ct. 240, 7 L. Ed. 2d 134 (1961). "True, inclusion of a past event motivating the plan adds the hazards of defective perception and memory to that of prevarication; but this does not demand exclusion or even excision, at least when, as here, the event is recent, is within the personal knowledge of the declarant and is so integrally included in the declaration of design as to make it unlikely in the last degree that the latter would be true and the former false." Id., 378. The victim's statement that she was going to meet "Don" had to be explained and placed in some context for it to have any meaning for the trier of fact. *State* v. *Smith,* 198 Conn. 147, 157–58, 502 A.2d 874 (1985). The only way that could be done was to have the victim's account of her meeting with the defendant brought to the jury's attention. The trial court did not abuse its discretion in allowing the state to do so. *State* v. *Boucino,* 199 Conn. 207, 228–29, 506 A.2d 125 (1986).

## IV

The defendant next claims that the trial court erred in several respects in its charge to the jury.

### A

The defendant claims first that the court should not have instructed the jury that one of the elements of the crime that the state had to prove beyond a reasonable doubt in order to convict him was that he was "of sound mind. That is legally sane [at the time of the crime]." The defendant does not argue that the court's instruction was technically incorrect. He argues, rather, that his sanity was never in question and, therefore, that the trial court "confused and misled the jury" by appearing to place it in issue.

The defendant did not present evidence concerning his sanity, raise insanity as a defense, or request a charge on insanity. The trial court erred, therefore, by instructing the jury, sua sponte, that the defendant's sanity was an element of the crime to be considered in this case. *State* v. *Rodgers,* 198 Conn. 53, 56, 502 A.2d 360 (1985). "The trial court should submit no issue to the jury which is foreign to the facts in evidence, or upon which no evidence was offered, and it should not submit to the jury considerations which find no support in the evidence." Id.; *State* v. *Cofone,* 164 Conn. 162, 168, 319 A.2d 381 (1972). "[T]he issue of insanity is not properly raised until 'substantial evidence' tending to prove insanity has come into the case." *State* v. *Rodgers,* supra; *State* v. *Rossier,* 175 Conn. 204, 209, 397 A.2d 110 (1978).

We find, however, that the trial court's error was harmless. Although the trial court incorrectly injected the defendant's sanity into the case, it promptly removed the issue by instructing the jury that "the law

presumes that an accused was of sound mind at the time of the incident . . . unless there is some credible evidence tending to prove the contrary. In this case, as I recall the evidence, there has been *no evidence* tending to prove that the defendant was not of sound mind." (Emphasis added.)

The insanity instruction complained of is not to be judged in artificial isolation from the overall charge. *State* v. *Dolphin,* 195 Conn. 444, 451, 488 A.2d 812, cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84 (1985); *State* v. *Reid,* 193 Conn. 646, 660, 480 A.2d 463 (1984). "The whole charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict . . . and not critically dissected in a microscopic search for possible error." *State* v. *Reddick,* 197 Conn. 115, 132, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986). A review of the entire charge makes it abundantly clear that the trial court's instructions effectively made the element of the defendant's sanity exactly what it was in this case, a nonissue. It is not reasonably probable that the jury was confused or misled to believe otherwise.[11] *State* v. *Orsini,* 187 Conn. 264, 276–77, 445 A.2d 887, cert. denied, 459 U.S. 861, 103 S. Ct. 136, 74 L. Ed. 2d 116 (1982); *State* v. *Mason,* 186 Conn. 574, 586–87, 442 A.2d 1335 (1982).

## B

The defendant next claims that the trial court erred by refusing to give his requested jury instruction concerning evidence, produced by the state, of a thumb print of the victim that was lifted from inside the front

---

[11] The defendant does not argue in his brief that the trial court's charge concerning sanity was constitutional error so as to require application of the reasonably possible standard. *State* v. *Annunziato,* 169 Conn. 517, 532 n.7, 363 A.2d 1011 (1975). Even under that standard, however, the charge would withstand scrutiny. See *State* v. *Ruiz,* 171 Conn. 264, 273, 368 A.2d 222 (1976).

passenger door window of the Cacchillo vehicle. The defendant requested the trial court to instruct the jury that, because the police had not kept a record of exactly where, on the inside of the window, the print was found and were, therefore, unable to testify to its exact location, the jury must "presume [it] was located in a position most favorable to the defendant, i.e., on the uppermost portion of the window—in other words, in a position that a person could have placed the print from the exterior of the vehicle with the window partially rolled down." In effect, the defendant requested that the jury be instructed to draw an adverse inference against the state because of the failure of the police to record the exact location of the victim's thumb print. The trial court did not err in refusing to give such an instruction.

The failure to produce a witness for trial who is available and whom a party would naturally be expected to call warrants an adverse inference instruction against the party who would be expected to call that witness. *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 674–75, 165 A.2d 598 (1960). In such a situation there is a logical nexus between the failure to call the witness and an adverse inference. In other words, it makes sense to infer that the witness' testimony, had the available witness testified, would be adverse to the party who would naturally be expected to call that witness but failed to do so. The scenario in this case is dissimilar. Here, the evidence of the exact location of the victim's thumb print did not exist, was impossible to resurrect and was obviously not available at the time of trial. The police officer simply failed to follow, what he admitted on cross-examination might be, the best possible procedure for obtaining, locating and recording fingerprint evidence. As a result, although he was able at trial to testify that the victim's thumb print was found on the inside of the car window, the officer was

unable to pinpoint the location. There is, however, no logical correlation between the inability of the state to produce the exact location of the victim's thumb print and an inference that if it were available it would be favorable to the defendant and adverse to the state. An inference to be drawn must be logical and reasonable and "strong enough so that it can be found that it is more probable than not that the fact to be inferred is true." *Reliance Ins. Co.* v. *Commission on Human Rights & Opportunities,* 172 Conn. 485, 490, 374 A.2d 1104 (1977). Nonproduction of the location of the victim's thumb print under these circumstances does not lead to a reasonable logical inference that it was located "on the uppermost portion of the window . . . in a position that a person could have placed the print from the exterior of the vehicle with the window partially rolled down."

An adverse inference instruction might be required if tangible evidence were deliberately destroyed or ignored to prevent its utilization by the defense. 2 J. Wigmore, Evidence (Chadbourn Rev. 1979) § 291. Absent proof of such deliberate action, however, it is illogical to postulate that the failure, even if negligent, of a police investigation to discover and record all available tangible evidence requires an inference that the tangible evidence, had it been discovered and recorded, would be favorable to the defendant. The defendant was certainly entitled to point out to the jury any infirmity in the state's case that he discerned by reason of the failure to record the exact location of the victim's thumb print. He was not, however, entitled to an adverse inference instruction.

C

The defendant also claims that the trial court erred by failing to instruct the jury, in accordance with his request, that if it found the prosecution had proved that

the thumb print lifted from inside the Cacchillo vehicle was that of the victim, it was to apply the following rule of law: "The presence of a person's fingerprint, if proven, on an item located at any particular location, is in and of itself of no moment, unless it has also been shown that the circumstances are such that the fingerprint could have been impressed only at the time relevant to the crime as alleged."[12]

The rule quoted has its Connecticut genesis in two cases: *State* v. *Mayell*, 163 Conn. 419, 311 A.2d 60 (1972), and *State* v. *Payne*, 186 Conn. 179, 440 A.2d 280 (1982). In *Mayell*, the defendant's conviction was set aside because it was based primarily, if not solely, on fingerprint evidence. Such evidence had little meaning, however, because the defendant was regularly employed to drive the vehicle in which his fingerprint was found and he was rightfully in the vehicle only six hours before the crime was allegedly committed. In *Payne*, the defendant's conviction was based solely on fingerprint evidence. It was reversed on the ground that there was insufficient evidence to convict because there was no corroboration of the state's claim that the defendant's fingerprint had been impressed on the victim's automobile at the time of the crime.

Those cases stand for the proposition "that a conviction may not stand on fingerprint evidence alone unless the prints were found under such circumstances that they could only have been impressed at the time the crime was perpetrated." *State* v. *Payne*, supra, 182. Under the circumstances of this case the requested instruction would have been inappropriate. See *State* v. *Gasparro*, 194 Conn. 96, 113, 480 A.2d 509 (1984), cert. denied, 474 U.S. 828, 106 S. Ct. 90, 88 L. Ed. 2d

[12] The defendant claims that it was possible for the victim's thumb print to have been left at a time other than when the crime was committed because the Cacchillo vehicle was frequently in the Fair Haven section and the victim lived and occasionally shopped in that area.

74 (1985). Such an instruction is germane where the fingerprints of an accused constitute the only evidence, or the principal evidence to convict. Here, however, contrary to the usual criminal case, the thumb print of the victim, not that of the accused, was in evidence and constituted only one piece of circumstantial evidence offered to prove a collateral issue. To have given the requested charge that the victim's fingerprint "was in and of itself of no moment," would have instructed the jury in a manner unrelated to the factual situation and the reason for which the fingerprint was offered. That reason was, not as in *Mayell* and *Payne* to prove beyond a reasonable doubt the presence of the accused at the scene of the crime at the time of the crime, but rather as circumstantial evidence tending to prove that the victim had been in the Cacchillo automobile at some point. It was for the jury to determine whether the victim's thumb print, coupled with the other evidence, had evidentiary value as proof that she was there on the evening of September 10.

The trial court apparently concluded that, under the factual circumstances of this case, the defendant's request to charge was misleading and unwarranted. See *State* v. *Vass,* 191 Conn. 604, 620–21, 469 A.2d 767 (1983); *State* v. *Maturo,* 188 Conn. 591, 600, 452 A.2d 642 (1982). We agree. There was no error in refusing to charge in accordance with that request. The trial court should submit to the jury only those issues relevant to the facts in issue. *Bonner* v. *Winter,* 175 Conn. 41, 48, 392 A.2d 436 (1978).

D

The defendant next claims that the trial court erred by refusing to instruct the jury in accordance with his request concerning the erasure of the tape of James Carrano's telephone call to the New Haven police

department on September 11.[13] The defendant's request to charge would have required the trial court to instruct the jury that because the tape was lost through the fault of the state he was entitled to an inference that the tape, if available, would have been favorable to the defendant and adverse to the state. We disagree.

As we indicated earlier, there is a logical nexus between the failure to call an available witness and drawing an adverse inference against the party who fails to call that witness. *Secondino* v. *New Haven Gas Co.*, supra, 674. When physical evidence, however, such as this tape, is lost prior to trial, and not destroyed intentionally to thwart the defense, there is no logical connection between the failure to produce the evidence and an adverse inference. It is the failure to produce *available* evidence that leads to a logical adverse inference. *Savard* v. *Marine Contracting, Inc.*, 471 F.2d 536, 541–42 (2d Cir. 1972), cert. denied sub nom. *Savard* v. *Perini Corporation*, 412 U.S. 943, 93 S. Ct. 2778, 37 L. Ed. 2d 404 (1973); *State* v. *Hogan*, 67 Conn. 581, 584, 35 A. 508 (1896); B. Holden & J. Daly, Connecticut Evidence § 65 (a). Lost or destroyed evidence may, in some instances, evoke sanctions. Practice Book § 755. Sanctions, however, must be distinguished from inferences. "[An] inference to be drawn must be one which in common experience leads naturally and logically to the fact inferred or presumed." *Reliance Ins. Co.* v. *Commission on Human Rights & Opportunities*, supra, 489. The fact that the September 11 tape was unavailable does not lead naturally and logically to the conclusion that its contents were unfavorable to the state and favorable to the defendant. The testimony in this case, in fact, indicated that the taped telephone

---

[13] This was James Carrano's telephone call to the New Haven police department in which he first reported his wife's disappearance.

call in question was routine, brief and neutral. The trial court did not err in refusing to give the defendant's requested instruction.[14]

## V

The defendant next claims that the trial court committed reversible error by denying the defendant's oral motion for disqualification from sentencing. The defendant's motion to recuse was based on his claim that the trial judge, prior to his scheduled sentencing, received and read a letter from Detective Leonard Pastore of the New Haven police department. Pastore's letter contained unsubstantiated, inflammatory comments and accusations concerning the defendant.[15] The trial court, on the record, acknowledged receiving and reading the letter but stated that it was "disregarding all [its] contents."

The defendant's motion for disqualification was procedurally deficient in that it was unaccompanied by either an affidavit setting forth the facts upon which it relied or a certificate of counsel attesting to the fact that the motion was made in good faith. The defendant's motion does not, therefore, comply with § 997 of the Practice Book. A motion to disqualify a judicial officer because of the claimed possibility of bias is a serious matter. If counsel makes such a motion, it is not asking too much to require that he or she follow the established rules that treat it as such. Oral motions to disqualify simply do not comport with acceptable procedure. In view, however, of the lengthy sentence imposed on the defendant, we will treat the merits of his motion briefly.

[14] The fact that in *State* v. *Hamele,* 188 Conn. 372, 382, 449 A.2d 1020 (1982), and in *State* v. *Doolittle,* 189 Conn. 183, 200 n.23, 455 A.2d 843 (1983), the trial court, in an abundance of caution or generosity, gave an adverse inference instruction because the state lost physical evidence does not mean that such instructions were required.

[15] It is the defendant's contention that the letter would necessarily have "tainted" the perception of the trial judge at sentencing.

"A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . . . " Code of Judicial Conduct 3.C. (1); *State v. Fullwood,* 194 Conn. 573, 579, 484 A.2d 435 (1984). Disqualification of a trial judge is not dependent on proof of actual bias. The appearance and existence of impartiality are both essential elements of a fair trial. *Cameron v. Cameron,* 187 Conn. 163, 168–69, 444 A.2d 915 (1982); *Postemski v. Landon,* 9 Conn. App. 320, 322, 518 A.2d 674 (1986). To impose, however, a requirement that a criminal trial court recuse itself every time it receives unsolicited material uncomplimentary to a defendant prior to trial or sentencing would create an intolerable situation which could lead to a manipulation of the criminal justice system. See *United States v. Hillsberg,* 812 F.2d 328, 335 (7th Cir.), cert. denied, 481 U.S. 1041, 107 S. Ct. 1981, 95 L. Ed. 2d 821 (1987). The trial court in this instance, on the record, brought the letter he had received to the attention of the defendant and noted that there was no basis for giving its allegations credence. He then emphatically and categorically stated that he could, and would, disregard the letter's contents.[16] There is no reason to believe he could not do so, or that a reasonable person would have cause to question his ability to do so.

The defendant claims that the fact that the trial court sentenced the defendant to the maximum statutory period of incarceration for murder clearly manifested partiality or its appearance. We disagree. The fact that a trial court rules adversely to a defendant does not demonstrate bias. *Hartford Federal Savings & Loan Assn. v. Tucker,* 192 Conn. 1, 8, 469 A.2d 778 (1984), cert. denied, 474 U.S. 920, 106 S. Ct. 250, 88 L. Ed. 2d 258 (1985); *Payton Health Care Facilities, Inc. v. Estate of Campbell,* 497 So. 2d 1233, 1238 (Fla. App.

---

[16] It goes almost without saying that Pastore's letter was inappropriate.

1986). The defendant's previous criminal record and the brutal nature of the crime of which he was convicted fully warranted the punishment imposed.

## VI

The defendant's final claim is that the evidence adduced at his trial was insufficient to sustain a conviction and that the trial court erred by denying his motion for acquittal. "When the claim on appeal challenges the sufficiency of the evidence, we undertake a two part task. 'We must first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus estabished and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt. . . .' " (Citations omitted.) *State* v. *Simino,* 200 Conn. 113, 116–17, 509 A.2d 1039 (1986); *State* v. *Rodriquez,* 200 Conn. 685, 687, 513 A.2d 71 (1986). "The relevant question in our review ' " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . .' " ' " (Emphasis in original; citations omitted.) *State* v. *Rodriquez,* supra, 688.

After a scrupulous review of the record we think it manifest that there was more than sufficient evidence to allow the jury to have found beyond a reasonable doubt that the defendant was guilty of the murder of the victim.

There is no error.

In this opinion the other justices concurred.